Wood v. Fitzgerald.

WOOD, Respondent, v. FITZGERALD and WINGATE, Appellants; and MAYS, Respondent, v. FITZGERALD and WINGATE, Appellants.

## Appeal from Wasco Circuit Court.*

LIMIT TO INQUIRY.—In contested election cases the law limits judicial inquiry to the votes returned upon the poll books.

RESIDENCE.—Though an employee of the United States or state government cannot "gain or lose a residence by reason of his presence or absence while employed in the service," yet he can establish his domicile, and gain a residence, at such a point as he may desire, by taking the proper and appropriate steps to do so, independently of his employment.

PARDON.—A general, absolute pardon, relieves the person to whom it is granted, not only from imprisonment, but from all the consequential disabilities of the judgment of conviction, and restores such person to the full enjoyment of his civil rights.

IDEM.—Article II, section 3, of the state constitution, does not operate as a restriction or limitation upon the effect of a pardon.

XV AMENDMENT TO CONSTITUTION OF UNITED STATES.—The fifteenth amendment to the federal constitution is a part of the supreme law of the land, and its effect is to annul those provisions of the state constitution, and those enactments of the state legislature, which restrict the exercise of the right of suffrage to white persons.

RESIDENCE.—PRECINCT.—Where an individual has established for himself a settled residence and a fixed domicile in any precinct in a county, there he must vote; where, however, an individual is a bona fide resident of a county, but has no fixed residence or domicile in any particular precinct therein, he may vote in any precinct in which he may find himself on the day of election.

NATURALIZATION.—By being naturalized an alien becomes instantly a citizen of the United States, and of this state, and as such has a right to vote for county officers at any election, at which such officers are to be chosen, occurring after his naturalization, if he has the necessary qualification as to residence in the state and county.

COSTS.—In cases of contest of election under title V of chapter 13 of the general laws, costs and disbursements cannot be recovered.

---

* Darragh, appellant, v. Bird, respondent; McFarland, appellant, v. Holland, respondent; Grant, appellant, v. Ruch, respondent; Wood, respondent, v. Fitzgerald and Wingate, appellants; and Mays, respondent, v. Fitzgerald and Wingate, appellants, were all contested election cases appealed from Wasco county. The case of Darragh v. Bird, was withdrawn. That of Grant v. Ruch, dismissed. The other cases were argued at length. For convenience the cases of Wood v. Fitzgerald and Wingate, and Mays v. Fitzgerald and Wingate, were considered at the same time, and are reported together. In the case of McFarland v. Holland, the respondent prevailed. No report of this last named case is deemed necessary, as the points passed upon therein are embraced in the cases reported.

Wood v. Fitzgerald.

THE facts are sufficiently set forth in the opinion.

*O. Humason* and *N. H. Gates,* for appellants.

*J. G. Wilson,* for respondents.

Counsel joined in one brief, citing constitution of Oregon, sections 2, 3, 4, 5, 6, p. 101; sec. 17, p. 103, and sec. 14, p. 110; Laws of Oregon, p. 696, 707, 708; sec. 13, p. 700; sec. 11, p. 699; sec. 18, p. 701; sec. 354, p. 237; 4 Cal. 175; 28 Cal. 123; 4 Barb. 504; 1 Kent, 86; 2 Kent, 431; 10 Iowa, 308; 19 Wend. 11; XV Amendment; Constitution IX and X Amendments; Reconstruction Act; McPherson's Manual, 1869, p. 448 and 457.

McARTHUR, J.    At the regular biennial election, held June 6th, 1870, E. Wingate and E. P. Fitzgerald; and Edwin Wood and Robert Mays, were candidates for the offices of county commissioners of Wasco County.    On June 14th, 1870, the board of canvassers, as provided by law, canvassed the votes polled at said election, and found that Wingate had received 314 votes; Fitzgerald, 316; Wood, 311, and Mays 303.    Thereupon Fitzgerald and Wingate were declared to be elected, and certificates of election were accordingly issued by the clerk of Wasco County.    On June 28, 1870, Wood and Mays commenced proceedings to contest the election of said parties, in the manner prescribed in title 5, of chapter 13 of the general laws.    The cases were submitted at the same time, and the court below, after casting out what it adjudged to be the illegal votes polled and counted for each of the said parties, arrived at the conclusion that of the legal votes cast, Woods had received 311, Mays 303; Fitzgerald 301, and Wingate 298.    Wood and Mays were accordingly adjudged to have been duly and legally elected, and to be entitled to the offices of commissioners of Wasco county.    From this judgment Fitzgerald and Wingate appeal.

The first point presented is one of interest.    On the trial of these causes it was insisted by appellants' counsel that

the votes of J. Ross, D. Lynch and William Sullivan should be added to the number polled for appellants; and it was as strenuously insisted by respondents' counsel that the votes of R. Graham, D. L. Reynolds, J. A. Foot, J. S. Morgan, P. Runey, A. Biddle, J. S. Paddleford, Wm. McKay and others—in all nineteen—should be added to the number polled for respondents. The names of these parties do not appear upon the poll books; but it is claimed that their votes were illegally rejected by the judges of election. The court below refused to count them, and as a reason for such refusal declared, in substance, that in its opinion the late limited judicial inquiry to the votes returned upon the poll books. And this ruling it is charged was erroneous. An examination into the duties of the judges of election, and the rights of electors is necessary, in order to arrive at correct conclusions on this point. It is the duty of judges of election to receive all votes offered and cause them to be entered upon the poll books by the clerks. If a challenge is interposed and insisted upon, it becomes the duty of said judges to tender to all persons offering to vote the oath prescribed and set forth in sec. 13, p. 700, general laws. If the person so challenged fails or refuses to take the prescribed oath, the same section declares that his vote shall be rejected. By sec. 14, p. 700, it is enacted that even if the person challenged takes the prescribed oath, further inquiry may be made into his qualifications, and if a majority of the judges are of opinion that he does not possess the qualifications of an elector, his vote shall be rejected. Though such an one is rejected and excluded from voting, sec. 18, p. 701, requires his name to be entered on the poll books as a rejected voter. It is also provided that the names of the persons for whom he intended to vote shall be taken down, the evident intention of the law being to have preserved a complete record of all rejected as well as all accepted votes. The wisdom and policy of this enactment is very apparent. Proper compliance with it facilitates judicial inquiry when necessary into the rights and qualifications of the voter, and at the same time tends to prevent improper

Wood *v.* Fitzgerald.

action on the part of judges of election. In refusing to record the votes of the persons named, the judges acted in direct contravention of law. They should have been received and entered upon the poll books as rejected voters. It is urged that notwithstanding the failure on the part of the judges to comply with the law, these votes should be counted, the evidence showing that they were properly offered and improperly rejected, conceding that the evidence is entitled to all the weight claimed for it, we find no authority for so doing. Cases of this nature must be heard and determined " in such a manner as shall carry into effect the expressed will of a majority of the legal voters, as indicated by their votes." (General laws, sec. 41, p. 708.) This *expressed will* can only be gathered from the poll books, and a vote must be recorded before it can be said to have obtained such an expression as the law contemplates. In contests such as this, the main question is, which candidate received the highest number of legal votes cast. It is claimed that the persons named did all they could to express their will and intention on election day; and that as the evidence shows they were qualified voters, their votes should be counted. It is unnecessary to discuss the evidence. Suffice it to say it is exceedingly unsatisfactory, and we cannot give it the weight which counsel claim for it. Besides, we are clearly convinced that it would be productive of arrant fraud and gross perjury to establish the rule that the courts could properly count the vote of a person who did not vote at the time of the election, and whose name is not to be found on the poll books, leaving it to be ascertained subsequent to the election from the testimony of such person himself in whose favor his vote would have been cast. If such a rule should be established, it would be both possible and probable that the result of elections, as declared by the board of canvassers and the will of the people, as expressed by the poll books, would frequently be changed and thwarted through the contrivance of the judges and the ready testimony of suborned witnesses. In refusing to count the votes of these persons, the court below did not err.

It is claimed by appellants' counsel that the court below erred in refusing to deduct the votes of B. P. Cardwell and Jacob Fritz from respondents' tally, for the reason that the the evidence establishes the fact that they are employees of the United States government, and consequently disqualified by article I, section 4, of the state constitution, which declares that "for the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, or of this state," and etc.    B. P. Cardwell came to Wasco County from Portland more than ninety days before the election, and brought with him his family. At the date of the election and for a long time prior thereto, he was and had been the deputy of the United States assessor and collector of internal revenue.    The court below found that the transfer of his domicile from Portland to Wasco County was accompanied by such appropriate acts on his part as to leave no doubt that it was a *bona fide* change of residence.    Jacob Fritz came to Wasco County in 1863, and was at that time a private soldier in G company of the Fourth Infantry of the United States regular army, and in 1865, his term of enlistment having expired, he was honorably discharged from the military service. Subsequently he was employed as a civilian by the proper authorities to take charge of the abandoned military post and reservation adjacent to the Dalles; he discharged no military duty whatever, but acted simply as a sort of keeper and protector of the government property in about the post abandoned. He continued to reside in Wasco County almost uninterruptedly from the time of his discharge from the military service until the day of the election, a period of almost five years.    Both these individuals were employees of the United States government and in the civil service. The facts being as above set forth, the question arises as to the applicability and effect of article II, section 4, of the state constitution to and upon the persons so situated. We cannot see the legal force or propriety of placing such a construction upon that section as would preclude an em-

Wood *v.* Fitzgerald.

ployee of the United States or state government from making any change in his domicile that he may desire to make. Though such an one cannot gain or lose a residence by reason of his presence or absence when employed in the service, yet he can establish his domicile and gain a residence at such a point as he may see fit, by taking the proper and appropriate steps so to do independently of his employment. In *The People* v. *Holden* (28 Cal. 137,) it was decided that section 4, of article II, of the constitution of California, (the language of which is almost identical with that of article II, section 4, of the constitution of Oregon,) does not add to or take from the conditions upon which the fact of residence is made to depend; and it was held that that section meant simply that in determining the fact of residence, presence or absence in the service of the United States shall not be taken into account, or in other words, neither presence nor absence in the service of the United States is a condition upon which the fact of residences can be affirmed or denied. It sufficiently appears that both Cardwell and Fritz had acquired a legal residence in Wasco County prior to the election. This they had a right to do; nor can any such interpretation be put upon the section of the constitution referred to as would prevent them from acquiring such residence, or from removing their residence from the locality at which they were domiciled at the time they entered the civil service of the United States government. They voted at the election, and had a legal right so to do, and the court below did not err in refusing to strike their votes from the number returned, as cast for the respondents.

Among those who cast their votes for the appellants was one Mathias Meng. On June 26, 1867, Meng was convicted of the crime of arson in the circuit court of the state of Oregon, for the county of Wasco. He was subsequently sentenced to imprisonment in the penitentiary for the term of five years. On September 25, 1867, and before the expiration of his sentence, he was pardoned by the governor of the state, and was released from imprisonment. The pardon was general and unconditional. Upon these facts,

the court below held, in substance, that while the pardon remitted the punishment and blotted out the offense for which Ming was incarcerated in the penitentiary, yet it did not restore him to his political rights; they had become forfeited and that there was no provision in the constitution or the laws that authorized or warranted their restitution. We cannot yield our assent to this proposition. The doctrine of pardons, as now recognized and applied by civilized nations has its origin in Divine law, upon which it rests, the merciful administration of human justice, and finds its sanction in the rules of political and social ethics, which have been firmly established and approved by the wisdom of ages. The pardoning power has been exercised from time immemorial by the sovereigns of those nations who have made any advancement whatever in the science of human government. Although it is liable to great abuse, yet, from the very necessity of things, no government could be said to be well ordered, without leaving this power somewhere vested. Every one who has made well directed investigations into this subject must, we think, reject the idea that the pardoning power is vested in the sovereign or executive solely with a view that its exercise may relieve convicted criminals from the punishment which the law inflicts as a consequence of their adjudged guilt. The administration of human justice being necessarily imperfect, it sometimes happens that from a combination of untoward circumstances, innocent individuals are adjudged to be guilty of the commission of crimes of which they are in reality innocent. Though such instances are of rare occurrence, the fact that they have occurred, and are likely to again occur, forbids that we should refuse to admit the fearful truth. The government so organized and administered as to preclude the possibility of relief to one thus unfortunate would present a very lamentable spectacle. It would defeat one of the main objects for which governments are formed—that of promoting the individual and collective happiness and welfare of mankind. The necessity and efficiency of the pardoning power will be much more readily acknowledged when it is

exercised to prevent injustice; it being ascertained that an error of the kind referred to has been committed; than when it is invoked to temper the judgment which the law has pronounced upon one whose guilt is established beyond peradventure. In the one case it should be extended as a matter of right, in the other, a matter of grace and mercy, it should be exercised with care and discrimination. Article V, section 14 of the state constitution vests in the governor in very general terms the power to grant reprieves, commutations and pardons, after conviction, for all offenses except treason. Article II, section 3, of the same instrument, declares that the privilege of an elector shall be forfeited by a conviction of any crime which is punishable by imprisonment in the penitentiary. As before stated, Meng was convicted of the crime of arson—a crime punishable by imprisonment in the penitentiary, and after such conviction, the governor moved by merciful consideration, granted him a general, absolute pardon. The question therefore arises, did the pardon restore to him the privileges of an elector, which were forfeited by his conviction of the said crime, or did it operate solely to relieve him from the corporal punishment of incarceration, leaving him to suffer all the other consequences flowing from such conviction. After careful consideration of the law as it exists, and the abundant authorities on this point, we can arrive at no other consistent or satisfactory conclusions than that a general absolute pardon relieves the offender not only from imprisonment but from all the consequential disabilities of the judgment of conviction, and restores him to the full enjoyment of his civil rights, with this restriction merely: "That it cannot divest any person of any right or interest, which the law has permitted to be acquired and vested in consequence of the judgment," (4 Blackstone's Commentaries, 402; 8 Bacon's Abr. Title Pardon; Hawkins' Pleas of the Crown, Title Pardon, b. 2, c. 37, sections 34 and 54.) It seems to us that it would be a cause of profound regret if the law were otherwise. In *The People* v. *Pease* (3 Johnson's Cases, 333–4), the inquiry of the court was directed towards ascertaining whether the pardon of

the governor did away with all the consequent legal disabilities which attached to one convicted of an infamous crime. It was held "That the disabilities formed no part of the judgment against a convict, but are the legal marks of infamy which it fixes upon him. When, therefore, the judgment is pardoned, the legal infamy flowing from it is equally disposed of by the pardon." The Court further declared the proposition that the judgment to which those disabilities are merely consequential can be released, and yet the disabling effect thereof remain, to be untenable. *In the matter of Deming* (10 Johnson, 233), the court wisely said that "policy and humanity require that we should give the convict so pardoned as complete a restoration of his private rights as may be consistent with the intervening rights and interests of others," and it held "that the effect of the pardon was to acquit the offender of all the penalties annexed to the conviction, and to give him new credit and capacity." The force and applicability of these decisions will be more readily observed by a comparison of the section of the constitution of Oregon, above cited, with very similar provisions in the constitution and the laws of New York. In *Perkins* v. *Stevens* (24 Pickering, 277), it was in substance declared that a full pardon of on offense removes all blemishes of character, wiped away the infamy of the conviction, and restores the convict to his civil rights. Article II, section 2, of the constitution of the United States, provided that the president "shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment." The power vested in the president by this provision of the federal constitution, is perhaps more extensive than that vested in the governor of this state by the provision of the state constitution already cited; but both rest upon the same broad principle, and there are no good reasons why the general rules adhered to in one case, should not govern in the other. The principles and powers are much too analogous to justify the application of different rules. In *Ex parte Garland* (4 Walace, 333–380), the supreme court of the United States,

Wood *v.* Fitzgerald.

decided that " a pàrdon reaches the punishment prescribed for an offense, and the guilt of the offender, and where the pardon is full, it releases the punishment, and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offense. If granted before conviction, it prevented any of the penalties and disabilities consequent upon conviction from attaching; if granted after conviction, it removes the penalties and disabilities, and restores him to all his civil rights." Hence we conclude that the pardon granted to Meng, restored to him the privilege of an elector, and that in striking his vote from the number cast for appellants, the court below erred. Before leaving this branch of the case, we would state that in our opinion, article II, section 3 of the state constitution, does not in any way operate as a restriction or limitation upon the effect of a pardon granted by the executive, the force and effect of that section being confined to those convicted of infamous crimes, from whom the executive clemency has been or may be withheld.

C. H. Yates and W. S. Ford, two negroes, voted for the respondents. On behalf of the appellants, it is urged, that being negroes, they were disqualified from voting by article 1, section 2, of the state constitution, and the laws passed in pursuance thereof, which limit the privilege of the elective franchise to white persons. On the other hand, it is urged, that they became legal voters upon the ratification of the fifteenth amendment to the federal constitution, and that therefore their votes should be allowed to stand as cast. The gravity of the question presented by the conflict of the state and federal constitutions, cannot be over estimated, and for various reasons we are led to examine into it with a degree of care and circumspection commensurate with its importance. On March 30, 1870, the secretary of state of the United States by proclamation declared, in substance, that the fifteenth amendment to the constitution of the United States had been ratified by the legislatures of the states of North Carolina, West Virginia, Massachusetts,

38

Wisconsin, Maine, Louisiana, Michigan, South Carolina, Pennsylvania, Arkansas, Connecticut, Florida, Illinois, Indiana, New York, New Hampshire, Nevada, Vermont, Virginia, Alabama, Missouri, Mississippi, Ohio, Iowa, Kansas, Minnesota, Rhode Island, Nebraska, Texas, and Georgia—in all, thirty states. It also appears from the said proclamation, that the state of New York, by its legislature, passed resolutions withdrawing the previous ratification. The power of a state thus to withdraw its previous ratification has been strenuously asserted and as strenuously denied. Upon the question, however, we do not pass, for even if the state of New York had the power so to do, the necessary number of states ratifying the said amendment still remains. It is conceded, that if the said amendment was legally ratified by the necessary number of states through their legislatures, and the proper returns made thereof to the department of state at the federal capital, then the secretary of state, acting in behalf of the president of the United States, had the power and authority, in the discharge of his official duty, to issue, or cause to be issued, such proclamation. The fact of his having issued it, basing his action, as he necessarily did, upon the official returns filed in the department over which he presides, carried with it *prima facie* evidence of the legal ratification of the said amendment. We cannot presume otherwise, than that he regularly performed his official duty, and that the resolutions of the legislatures of the states named, ratifying the amendment were in his custody, having been placed there officially. In the record and proofs of this case we find nothing overcoming this *prima facie* evidence or lessening the force of this presumption. The question of the legality of the ratification of this amendment is one which is exceedingly difficult of solution. If it is a political question, it can only be properly passed upon by the people or their representatives, and judicial inquiry is, from the very nature thereof, precluded. If judicial, then the courts have the power to inquire into and pass upon every step taken and every vote cast, in congress and in the legislatures, in

Wood v. Fitzgerald.

every stage of the progress of the amendment, from the time it was first proposed in the congress of the United States, to the date of the issuing of the proclamation by the secretary of state. This would certainly open up a wider range of jurisdiction than has ever before been traversed by any state court, and whatever may be the powers of the federal courts in this direction, it must be conceded, we think, that no state court has the necessary power or jurisdiction to marshal before it, the proofs necessary to establish any disputed question of fact in connection with the passage and ratification of this amendment.

Let us assume, however, for the purposes of this case, that it is a judicial question. A careful examination of the records discloses nothing to warrant the court in pronouncing it illegal and void. It is true, counsel in the argument, alluded to certain facts of pretty general notoriety, which, if true and properly established, would undoubtedly weigh heavily against the validity of the amendment, but they were all extraneous to the record, and lacked those qualities necessary to command or justify judicial consideration. The manner of the adoption of this amendment is a matter of history, and while individuals may be constrained to believe it an unwise measure of government policy, and while the very peculiar circumstances attending its ratification by the legislatures of some of the states render it obnoxious to exception, yet in view of the ascertained facts in this case, we cannot do otherwise than declare it to be a valid amendment to the federal constitution. To hold otherwise under the circumstances would be to unwarrantably overthrow certain well established principles of law, and give to judicial discussion such a coloring of partisan feeling as would lead to very unfortunate results. We proceed next to consider the effect of this amendment upon article II, sec. 2, of the state constitution. Prior to the ratification of the said amendment the several states had complete control over all questions of suffrage, that being among the powers reserved by the tenth amendment to the federal constitution. By the ratification of the fifthteenth amendment they in a measure parted

with this reserved right, so far as to acquiese in the removal of all restrictions heretofore existing "on account of color, or previous condition of servitude," and to agree not to abridge the right granted by that amendment, leaving negroes, who are recognized as citizens by certain acts of the federal congress, free to exercise the privileges of the elective franchise in any and all the states upon the same conditions as white persons. Having been ratified, this amendment became a part of the federal constitution—part of the supreme law of the land—and its effect is to deprive the provisions of the state constitution and the acts of the state legislature, restricting the exercise of the suffrage to white persons, of all legal force and efficacy. The votes of Yates and Ford will remain as cast, and as counted by the court below. In passing upon this case, the court below refused to allow the votes of seven persons, cast for appellants, and those of four other persons cast for the respondents; it having found that though otherwise qualified, they voted out of the several precincts in which it was claimed they resided. Article II, section 17, of the state constitution, declares that "all qualified electors shall vote in the election precinct in the county where they may reside for county officers, and in any county in the state for state officers, or in any county of a congressional district in which such elector may reside for members of congress." This provision appears to be the basis upon which rests section 1 of title I of chapter XIII, p. 695 of the general laws, which section provides, among other things, "that ninety days *bona fide* residence in a county, next preceding an election, shall be required to entitle a person to vote for county and precinct officers, and likewise ninety days preceding such election in a district for district officers." It clearly appears that a person who has resided in the state of Oregon for six months, and is otherwise qualified, may cast his vote for any candidate for any state office in any county in the state, also, that being a citizen of the state, and having resided in a certain district ninety days next preceding an election, he may vote for any candidate for any district office in any county in the district wherein he

may be on the day of the election. Assuredly, then, the logical sequence would be, that, having resided in a certain county ninety days next preceding an election, the elector may vote for county officers in any part, or precinct rather, of the county. But it is not in view of the law proposed to lay down such a broad and comprehensive rule, the purpose of this inquiry being simply to ascertain and arrive at what should be the just and proper rule by which to decide the exact point presented.

It appears that the persons referred to, though they resided within the county, had no fixed and settled domicile in any precinct therein, but that from the nature of their avocations—being for the most part stock raisers, herders and transporters of freight—were constantly changing the locality of their temporary domiciles. There is no law upon the statute book which fairly reaches the circumstances of the persons whose right to vote is now being inquired into. General rules we have, and a number of legislative enactments, which, if we were to construe them narrowly, might be cited in opposition to their right to vote. But it is not our intention to place upon these laws an interpretation which, while it agrees with the letter, totally disregards the spirit thereof. Every qualified resident of a county has a right to cast his vote therein for county officers. As a matter of abstract justice, the mere fact of his being fixedly domiciled in some one of the precincts therein, should not invest him with greater rights than should be accorded to one who may chance to reside in a part of the county where no precinct has been erected, or to one whose employment obliges him to shift his domicile from point to point, with such frequency as to prevent him from acquiring the qualification of a residence of ninety days in any given precinct. All these classes are equally interested in the proper administration of the affairs of the county, as well as of the district or of the state, and should in all fairness be allowed a vote. It is true that when an individual has established for himself a settled residence and fixed domicile in any precinct of a county, there he must vote. When, however,

an individual is a *bona fide* resident of a county, but has no fixed residence or domicile in any particular precinct therein, he may vote in any precinct in which he finds himself on the day of election. It may be that by allowing this class of persons to vote in whatever precinct they chance to be on the election days, may increase the facilities for the perpetration of fraud, and may induce reckless persons to repeat their votes, but if the laws punishing fraudulent voters are enforced as they should be; the danger to be apprehended is not so great as the wrong of unnecessarily and arbitrarily restricting the privileges of that large number of worthy and energetic citizens, who, from the nature of their honest employment, frequently have no fixed residence, and are constantly called upon to shift even their temporary abodes, from point to point, in order to properly conduct their business. Being well assured that our views upon this branch of the case agree with the spirit of the law, we shall allow these votes to remain as they stand upon the poll books.

Appellant's counsel charge error in the court below, in counting the votes of H. Crellish, E. Bernard, and E. A. Willis. These persons voted for the respondent, but it appears that their votes were excluded from the final count by the judges of election, in the manner prescribed by section 23, p. 702, of the general laws. From the statement of agreed facts, it appears that they were all persons of foreign birth, and that they had resided long enough in the state and county to be entitled to vote, if otherwise qualified. It also appears that they had been naturalized less than six months prior to the election, and having previously served in the armies of the United States, were admitted to citizenship in the manner set forth in section 171 of the act of congress, in relation to the naturalization of aliens. It is urged that, notwithstanding this section dispenses with any previous declarations of intentions, and permits the naturalization of an alien, under certain circumstances, to proceed without such previous declaration, still such person cannot exercise the privilege of an elector until one year has

elapsed from the date of his naturalization. In support of this proposition, counsel cite article II, section 2, of the state constitution, and particularly that part thereof, which declares that "every white male of foreign birth of the age of twenty-one years and upwards, who shall have resided in the United States one year, and shall have resided in this State during the six months immediately preceding such election, and shall have declared his intention to become a citizen of the United States one year preceding such election, * * * shall be entitled to vote, at all elections authorized by law," and insist that in cases such as these, this constitutional provision becomes a dead letter, unless we treat the naturalization of an alien under section seventeen of the act of congress referred to, as nothing more than a declaration of intention, and refuse him the privilege of voting until a full year has elapsed from the date of such naturalization. We confess our utter inability to discover any legal or logical force in the proposition presented. The question: Should these votes be counted? furnishes its own answer. When these persons were naturalized, they became citizens of the United States instantly, and as such had a right to vote, for it is agreed that they had resided in the state and county a much greater length of time than the law requires. The court below counted these votes, adding them to the number cast for respondent, and in so doing, did not err.

The next question of importance that presents itself, is as to the proper disposition of the costs herein. The court below having found in favor of the respondents, adjudged that they have and recover costs and disbursements. Was this judgment erroneous? We think it was, and for these reasons. All the authorities concur in declaring the right to recover costs to be purely statutory. No such right existed at common law. The authority to tax costs and disbursements *eo nomine* in favor of the prevailing party in the English courts, is found in the statute of Gloucester, 6 Edward I, c. 1, and in the statutes, 23 Henry VIII, c. 15; 4 James I, c. 3; 8 & 9 William III, c. 11; and 4 and 5 Anne,

c. 16; and the various amendments thereto. In this state, the right to recover costs is given by the code; the provisions in relation thereto being in principle and effect similar to the English statutes named. The rule above set forth is clearly laid down in *Clark* v. *Dewey* (15 Johnson, 250); in *Waterman* v. *Benschotten* (113 Johnson, 425), and in *The Supervisors of Onondaga* v. *Briggs* (3 Denio, 174), and is fully recognized and followed in *McDonald* v. *Evans*, recently decided by this court. Upon this point, see Bouvier's Dictionary, vol. 1, title, costs, subdivision 2, and the authorities there cited. These principles of law being settled clearly and beyond all contention, let us apply them to this case. Title V of chapter 13 of the general laws, provides for and points out the manner of contesting the election of district, county, and precinct officers. It is singularly silent upon the subject of costs and disbursements. Title V, of chapter 6 of the code of civil procedure, is devoted entirely to the subject of costs and disbursements, and sections 539 and 541 enumerate or describe the cases in which the plaintiff or defendant is allowed to recover costs. Neither of the sections contain any reference to a case of contest of election. It is evidently a *casus omissus*. Section 543 of the code, provides that "a party entitled to costs, shall also be allowed for all necessary disbursements," etc.

From the application of the rules of construction just referred to, it follows, that unless a party is allowed costs he cannot recover disbursements. For the recovery of disbursements is made dependent upon the recovery of costs by the statute. It follows, therefore, that in cases of contest of election, under title V, of chapter 13 of the general laws, costs and disbursements cannot be recovered, and the court below erred in entering a judgment therefor.

As regards the votes of the other persons named in the brief, and referred to in the argument, we find that they were disposed of on questions of fact solely, and upon examination, we have concluded not to interfere with the findings of the court below in relation thereto.

Wood *v.* Fitzgerald.

From the above, it follows, that to the number of votes polled for Wood and Mays, as ascertained by the court below, there should be added the votes of Zettler, Snooks, Brown and Curry; and to the number of votes polled for Fitzgerald and Wingate, should be added the votes of Henderson, Kimberlin, Masterson, Scroggins, Manning, Williams, Strau and Mong. The number of legal votes, therefore, for each candidate stands as follows: Wood, 315; Fitzgerald, 309; Mays, 307 and Wingate, 306. Wood and Fitzgerald having each a majority over the other candidates, are entitled to the offices of commissioners of Wasco County.

Let judgment be entered and certificates issued accordingly.