Submitted on briefs January 27; alternative writ of mandamus dismissed, and petition for writ of mandamus denied, with instructions regarding petitions for reconsideration, February 17, 2022

# State ex rel Nicholas KRISTOF,
## *Plaintiff-Relator,*

*v.*

# Shemia FAGAN,
## Secretary of State of the State of Oregon,
## *Defendant.*
## (SC S069165)

504 P3d 1163

The Secretary of State rejected relator's declaration of candidacy for governor, concluding that relator did not satisfy the three-year durational residency requirement to serve as governor, which is contained in Article V, section 2, of the Oregon Constitution. Relator filed a writ of mandamus in the Supreme Court, seeking to compel the Secretary of State to accept his declaration of candidacy. *Held*: (1) As used in Article V, section 2, the words "resident within" refer to the legal concept of domicile; (2) the record before the secretary did not compel a conclusion that relator was domiciled in Oregon between November 2019 and December 2020; (3) relator's argument that the durational residency requirement in Article V, section 2, violated the Equal Protection Clause of the United States Constitution was not properly considered in mandamus.

The alternative writ of mandamus is dismissed, and the petition for writ of mandamus is denied. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the appellate judgment on February 23, 2022, unless a petition for reconsideration is electronically filed by 5:00 p.m. on February 22, 2022. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 5:00 p.m. on February 24, 2022. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.

Original proceeding in mandamus.

Misha Isaak, Perkins Coie, Portland, filed the briefs for plaintiff-relator. Also on the briefs were Thomas R. Johnson and Jeremy A. Carp.

Benjamin Gutman, Solicitor General, Salem, filed the brief for defendant. Also on the brief were Ellen F. Rosenblum, Attorney General, and Kirsten M. Naito, Christopher A. Perdue, and Patricia G. Rincon, Assistant Attorneys General.

Nicholas Kahl, Nick Kahl, LLC, Portland, filed the brief for *amici curiae* WLnsvey Campos, Imani Dorsey, Nancy Haque, Reyna Lopez, Becca Uherbelau, and Andrea Valderrama.

Thomas M. Christ, Sussman Shank, LLP, Portland, filed the brief for *amici curiae* Bill Bradbury and Jeanne Atkins.

Drew L. Eyman, Snell & Wilmer, LLP, Portland, filed the brief for *amici curiae* Leaven Community Land and Housing Coalition, Dr. Angela E. Addae, and David Fidanque. Also on the brief was Clifford S. Davidson, Portland.

Harry B. Wilson, Markowitz Herbold, PC, Portland, filed the brief for *amicus curiae* Derrin "Dag" Robinson. Also on the brief was Hannah K. Hoffman, Portland.

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, and Nelson, Justices, and Landau and Nakamoto, Senior Judges, Justices pro tempore.*

PER CURIAM

The alternative writ of mandamus is dismissed, and the petition for writ of mandamus is denied. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the appellate judgment on February 23, 2022, unless a petition for reconsideration is electronically filed by 5:00 p.m. on February 22, 2022. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 5:00 p.m. on February 24, 2022. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.

––––––––––––––
* Garrett and DeHoog, JJ., did not participate in the consideration or decision of this case.

**PER CURIAM**

Relator is a prospective candidate for governor. After he filed his declaration of candidacy with the Secretary of State, the secretary asked relator for additional information to substantiate that he will "have been three years next preceding his election, a resident within this State," as required to serve as governor by Article V, section 2, of the Oregon Constitution. Relator submitted additional materials in support of his claim that he meets the constitutional eligibility requirement. Upon reviewing those materials, the secretary determined that, although relator had previously been a resident of Oregon, he had been a resident of New York since at least 2000 and he had not reestablished Oregon residency by November 2019. The secretary therefore concluded that relator did not meet the constitutional requirement. The secretary notified relator of that determination, informing him that, as a result, his name would not be placed on the ballot in the primary election. The next day, relator filed a petition for writ of mandamus in this court, asking us to direct the secretary to reverse her determination and to instruct county officials to place relator's name on the ballot. The secretary agreed that this court should decide this case. We issued an alternative writ of mandamus directed to the secretary and set an expedited schedule for briefing.

In communicating its decision to relator, the Elections Division correctly emphasized that "it is not the Elections Division's role to determine whether any candidate is sufficiently 'Oregonian'" or "to examine the depth or sincerity of a candidate's emotional connection to Oregon." That is not this court's role either. It is undisputed that relator has deep roots in Oregon and has consistently spent time here over many years. This case, however, requires us to decide two legal questions: (1) the meaning of "resident within this State," as those words are used in Article V, section 2, of the Oregon Constitution; and (2) whether the secretary was required to conclude that relator met that legal standard. As we explain below, we conclude that "resident within," when viewed against the legal context that surrounded the Oregon Constitution's 1857 ratification, is best understood to refer to the legal concept of "domicile,"

which requires "the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely[.]" *Reed's Will*, 48 Or 500, 504, 87 P 763 (1906). Under that legal concept, a person can have only a single residence at a time. *Id*. For the reasons that follow, we further hold that, on the record before the secretary, she was not required to conclude that relator was domiciled in Oregon between November 2019 and December 2020. Finally, although relator challenges the constitutionality of the durational residency requirement in Article V, section 2, we conclude that that question is not properly considered through this mandamus proceeding. We therefore dismiss the alternative writ and deny relator's petition.

## I.  BACKGROUND

Relator is an author, journalist, and farmer who wishes to run for governor, as a candidate in the Democratic primary. Relator filed with the Secretary of State as a candidate on December 20, 2021. The next day, the Elections Division reached out to his campaign, stating that it needed additional information to process the filing, in connection with the requirement in Article V, section 2, of the Oregon Constitution that a candidate for governor shall have been an Oregon resident for three years before the election. The letter noted that relator had voted in New York State as recently as 2020.

Relator responded with a lengthy packet of materials, including an affidavit from relator, two declarations from relator's friends, and excerpts of relator's writings referring to Oregon. The packet also included legal materials and analysis in support of an argument that relator had been an Oregon resident for three years or more. The information contained in the packet, detailing relator's connections to Oregon, was substantially as follows.

Relator moved to Oregon in 1971, at the age of 12. He lived on a farm in Yamhill County that was owned by his parents. Relator left Oregon to attend college in 1978. He began working for the New York Times in 1984. He spent at least some part of the years between 1978 and 2000 abroad, including in China and Japan, due to his employment as a journalist. During that 22-year period, relator

was registered to vote in Oregon and maintained an Oregon driver's license.

During that same period, relator began to purchase property in Oregon. Relator first purchased a 150-acre property in Yamhill County in 1993. He subsequently purchased another property, around twice the size, in McMinnville. Relator managed both properties, including by planting trees, stocking ponds, maintaining roads, managing government forestry programs, and renting out cropland. Relator has paid Oregon property taxes on both pieces of property since purchasing them.

Relator also remained involved with the family farm. From 1984, relator spent "part of every summer" on the family farm in Oregon, with the exception of 1989. However, the only year in which he spent most of his time in Oregon was 1994. Other than that, relator's submission gave no specifics about how much time relator would typically spend in Oregon. In 1994, he built an addition to the family farm that included bedrooms for himself and his wife, and for his children. Relator and his immediate family keep personal items at the farm, and he continues to receive mail there. In 2010, when relator's father died, relator "assumed his responsibilities as primary manager of the farm." That involved "maintain[ing] farm equipment, order[ing] trees, repair[ing] roads, and manag[ing] timber."

However, relator also developed connections with the State of New York, in addition to his employment at the New York Times. In 1999, relator purchased a home in Scarsdale, New York. In 2000, relator began filing income taxes in New York, and he registered to vote there at the same time. In addition, likewise beginning in 2000, relator obtained and maintained a New York driver's license, which he maintained until December 2020. Relator's children attended public schools in Scarsdale, New York, with the exception of 1999, when they attended school in Oregon. Relator was employed by the New York Times until October 2021.

Relator began spending more time in Oregon in 2018 and 2019, much of it in connection with a book that he was writing about economic and social changes in Yamhill County. He and his wife "spent considerable time during

[2018] and in 2019 at home in Oregon conducting interviews and other research for the book," although he provides no further indication of the extent of his time in Oregon during those years, compared to his time in New York. At the same time, relator made a "significant investment of time, effort, and money to transition the family farm, whose primary crop had been cherries, to grow cider apples and wine grapes instead." Relator began leasing the farm from his mother, and he and his wife formed an Oregon limited liability corporation in August 2019. Relator hired three employees, whom he supervises. Relator also purchased additional acreage adjacent to the farm in 2020. Relator filed Oregon income taxes, as well as New York income taxes, in 2019 and 2020, although he did not include in his submission whether he had filed in Oregon as a resident or nonresident. Although relator was physically present in Oregon at the time, he cast a New York ballot in the 2020 general election. Relator did not change his voter registration to Oregon until December 2020. Relator likewise retained a New York driver's license until December 2020.

Relator's affidavit states that he has viewed Oregon as his "home" since he moved here at the age of 12. Relator's submission includes four interviews or pieces of writing in which he referred to Oregon as his home. Relator states that the family farm is where he lives and where he feels at home, and he plans to retire to Oregon. He further states that "[i]t is my intention that I am a resident of the State of Oregon," both during and prior to the three-year period at issue in this case.

Relator's packet also contains declarations from two of his friends. The first, a resident of Yamhill County, confirms that relator returned to Oregon virtually every year and that relator has spent more time in Oregon since 2018. He states that his "observation has been that [relator] always thought of and treated Yamhill and his family farm here as his permanent home." The second confirms that relator "considers Yamhill to be his home, and has for the entire duration of our acquaintance."

On January 6, 2021, the Elections Division sent relator a letter notifying him that, after reviewing the

information that he had provided, it had determined that he was not qualified to run for governor in 2022 because he had not been a resident of Oregon since November 2019. The letter explained the Elections Division's understanding of residency as follows:

> "In evaluating whether a person meets Oregon residency requirements, we consider a 'residence' to be a place in which a person's habitation is fixed and to which, when they are absent, they intend to return. While a person's statement of their intent is significant, we also consider a person's prior acts. We cannot ignore past acts that strongly indicate the person's state of mind at that time, even if the person's current sworn statement indicates a different intent."

The letter noted that relator was registered to vote in New York from 2000 until December 2020 and that he maintained a New York driver's license over that same period. The letter also noted that relator paid New York income taxes over the same period but had only begun filing Oregon income tax returns in 2019 and did not indicate whether he did so as a nonresident. The letter placed heaviest reliance on relator's voting record, noting that "the place where a person votes is particularly powerful, because voting is the center of engaged citizenship."

The letter also noted that relator

> "worked in New York (journalism) and in Oregon (owning/leasing and managing farm property). You stated that you have hired and supervised employees since 2019, but you did not state the extent of your supervision or whether you supervised employees in person or from New York."

Along the same lines, the letter stated that "[t]he letters from your legal counsel are thorough in detailing your various connections to Oregon. We reasonably infer that you were comprehensive in providing all relevant information."

The letter concluded that "the objective facts, including your decision to vote in New York, convincingly suggest that you resided in New York at least from November 2019 to December 2020." The letter informed relator that, as a result, his name would not be placed on the May 2022 primary ballot.

The next day, relator filed a petition for a writ of mandamus in this court. The mandamus petition named the Secretary of State as defendant and sought a peremptory or alternative writ directing her "to accept the declaration of candidacy filed by [relator], deem [him] eligible to hold the office of Governor, and submit his name to the clerk of each county for inclusion as a candidate to be the Democratic nominee for Governor on the May 2022 primary ballot." The correspondence between relator's counsel and the Elections Division, including the packet of materials that relator had submitted and the secretary's adverse decision, was attached as the appendix to the petition. The petition contended that mandamus was an appropriate remedy because of the tight timeline imposed by the fact that the final list of candidates for the primary election ballot must be submitted by March 17. Although relator acknowledged that he could seek review of the secretary's decision in the Marion County Circuit Court, he contended that that remedy was inadequate because an appeal of such a decision would not be resolved by March 17. Relator observed that this court has used mandamus as a remedy in similar ballot qualification decisions involving tight timelines.

The secretary filed a response, stating that "[t]his court is the only body that can definitively resolve the constitutional residency question at issue here" and that mandamus is the process most likely to ensure that this court addresses the issue before the election, which "is in the interest of all Oregonians."

After receiving the response, this court issued an alternative writ and set an expedited briefing schedule. The parties' briefs have now been filed, as have several briefs by *amici curiae*.

## II.   ANALYSIS

### A.   *The Meaning of "Resident" in Article V, Section 2*

Article V, section 2, of the Oregon Constitution provides that

"[n]o person except a citizen of the United States, shall be eligible to the Office of Governor, nor shall any person be eligible to that office who shall not have attained the age of

thirty years, and who shall not have been three years next preceding his election, a resident within this State."

The principal dispute between relator and the secretary involves the meaning of "resident within this State." Before beginning that analysis, we describe the positions taken by the parties. The secretary argues that "resident within" takes its meaning from the established legal concept of domicile, which requires "the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely[.]" *Reed's Will*, 48 Or at 504. The secretary contends that that interpretation of "resident" was common at the time that the Oregon Constitution was ratified; under that interpretation, a person can be a resident within only one state at a time; and it is the only interpretation that yields a sufficiently definite standard.

Relator argues for a looser standard. He contends that a resident is "someone who intends to be at home in Oregon and acts pursuant to that intent," a definition that would allow a person to be considered a resident of two different states at the same time. He argues that residency is a distinct concept from domicile.

Although the residency requirement of Article V, section 2, has been part of the Oregon Constitution since 1859, this court has not yet had occasion to interpret it. To determine what Article V, section 2, requires, we consider "[i]ts specific wording, the case law surrounding it, and the historical circumstances that led to its creation." *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992).

We begin with the wording of Article V, section 2. In advocating for the proposition that resident means domiciliary, the secretary places heavy emphasis on legal dictionaries from around the time of ratification. One such dictionary defines "resident" as "[a] person coming into a place with intention to establish his domicil or permanent residence, and who in consequence actually remains there." John Bouvier, 2 *A Law Dictionary Adapted to the Constitution and Laws of the United States of America* 468 (9th ed 1860). Another, though, defines "resident" more generically, as "[o]ne who has a seat or settlement in a place; one who dwells, abides, or lies in a place." Alexander M. Burrill, 2 *A New*

*Law Dictionary and Glossary* 891 (1851). In the accompanying definition of the word "residence," Burrill elaborates that residence "is made also synonymous with *domicil*, (*domicilium*,) by [Henry Spelman] and other high authorities; but *domicil* in some of its applications imports something more than residence." *Id.* The loose definition of "resident" as one who "dwells, abides, or lies in a place" could indicate that—contrary to the secretary's position here—one could be a "resident" of two or more places at the same time. However, Bouvier's more specific definition of a "person coming into a place with intention to establish his domicil or permanent residence, and who in consequence actually remains there," by incorporating the concept of domicile, suggests that a person can have only a single residence at a time. *See Reed's Will*, 48 Or at 505 ("Every person is assumed by the law to have one domicile and one only.").

Dictionary definitions "do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) (emphasis in original). The definitions discussed above show that "resident" could mean "domicile" in some contexts, but not in others. We must examine the context more closely to determine what "resident" means in Article V, section 2.

One valuable source of context are the other uses of "resident" in the Oregon Constitution. Article II, section 2, as originally ratified in 1857, limited the right to vote to "white male citizen[s] of the United States, of the age of twenty one years, and upwards, who shall have resided in the State during the six months immediately preceding such election[,]" as well as certain noncitizens meeting the same residency requirement. That usage, in and of itself, sheds little light on what the ratifiers would have understood "resident" to mean, but two accompanying provisions lend substantial insight. Article II, section 4, provides:

> "For the purpose of voting, no person shall be deemed to have gained, or lost a residence, by reason of his presence or absence while employed in the service of the United States, or of this State; nor while engaged in the navigation of the waters of this State, or of the United States, or of the high seas; nor while a student of any Seminary of Learning; nor

while kept at any alms house, or other assylum [*sic*], at public expence [*sic*]; nor while confined in any public prison."

Article II, section 5, contains a similar provision, applicable to servicemembers stationed in Oregon:

"No soldier, seaman, or marine in the Army, or Navy of the United States, or of their allies, shall be deemed to have acquired a residence in the state, in consequence of having been stationed within the same; nor shall any such soldier, seaman, or marine have the right to vote."

Those provisions show that the residency requirement for voting did not turn entirely on physical presence. They make clear that even extended periods of absence from the state do not disqualify a person from being counted as a resident for that purpose, provided that the reason for the absence is one of those listed, all of which either have a temporary character or are likely to be involuntary. And, conversely, they reveal that even extended physical presence within the state is insufficient, in and of itself, to make a person a resident.

In tying residence to an intended and permanent association, rather than to mandated or temporary physical presence within or outside the state, those provisions of Article II cohere with the legal concept of domicile. Domicile, like residence for the purpose of voting, is not lost when a person temporarily leaves a domicile that has already been established, nor is it gained without an intent to remain indefinitely. *See Reed's Will*, 48 Or at 504 ("To constitute domicile there must be both the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely[.]"). And, in one early case interpreting Article II, section 4, this court drew precisely that linkage between residency for voting purposes and domicile, holding that a person "cannot gain or lose a residence by reason of his presence or absence when employed in the service, yet he can establish his domicile and gain a residence at such a point as he may see fit, by taking the proper and appropriate steps so to do independently of his employment." *Wood v. Fitzgerald*, 3 Or 568, 573 (1870).

That "residence" and "resided" are linked to domicile in the voting provisions of Article II of course does not

*necessarily* mean that "resident," as used in Article V, section 2, means the same thing. But it would be unusual for Article V, section 2, which applies in the context of Oregon's highest executive office, to use the word "resident" in a way that is less stringent than the way that term is used with respect to all voters.[1]

We also consider the history behind the adoption of Article V, section 2. Whether the Oregon Constitution should contain a durational residency requirement for governor at all was a subject of debate at Oregon's constitutional convention. James Kelly, a proponent of the durational residency requirement, argued, "Why should a man be elected our chief executive who had only just arrived amongst us? A man should know something of the state before he assumed to take into his hands the reins of the government." Oregon Statesman, Sept 8, 1857, *reprinted in* Charles H. Carey, *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 222 (1926). Another proponent, Frederick Waymire, stated that he was "in for a good acquaintance before he bestowed favor on any man." *Id*. He worried that, in the absence of such a requirement, Oregon would have

> "half the office-seekers of California up here.—Strangers came here sometimes and married our girls, when at the same time they had wives in the States, and he was opposed to giving our substance into the hands of strangers."

Claudia Burton, *A Legislative History of the Oregon Constitution of 1857 - Part II (Frame of Government: Articles III - VII)*, 39 Willamette L Rev 245, 347 (2003). By contrast, opponents of the durational residency requirement, such as William Starkweather, contended that "no shackles should

---

[1] Less clear is the significance of an early residency requirement for the Secretary of State that was formerly contained in Article VI, section 5: "The Governor, and the Secretary, and Treasurer of State shall severally keep the public records, books and papers in any manner relating to their respective offices, at the seat of government, *at which place also, the Secretary of State shall reside*." Or Const, Art VI, section 5 (1859) (emphasis added). Relator contends that some early holders of the office were not domiciled in Marion County, perhaps suggesting that that use of "reside" meant something different, but relator does not supply examples. Absent additional evidence bearing on what "reside" meant in the original Article VI, section 5, it sheds little light on the meaning of related terms elsewhere in the constitution.

be put upon the people in the choice of their officers." Oregon Statesman, Sept 8, 1857, *reprinted in* Carey, *The Oregon Constitution* at 222. Another opponent "was in favor of the people selecting their officers without regard to limit as to residence." *Id.* In addition, Starkweather expressed concern that the requirement could "keep all the offices in the hands of a few." Burton, 39 Willamette L Rev at 347-48.

The debate provides insight into why the durational residency requirement was included in Article V, section 2, though it sheds relatively little light on precisely what "resident" was understood to mean. Delegates on both sides of the issue evidently understood the durational residency requirement to impose a meaningful limit on who could serve as governor. Moreover, although it is a peculiar example, Waymire's concern with bigamists suggests that the requirement was intended to bar office seekers who, despite some Oregon connections, might retain a more significant connection to another state.

But what we find most informative is the legal backdrop against which Article V, section 2, was ratified. During the mid-nineteenth century, laws or constitutions that included residency requirements for voting or officeholding were commonplace, and they were overwhelmingly interpreted to require domicile. As one treatise explained,

> "'[r]esidence' when used in statutes is generally construed to mean 'domicil.' In fact, the great bulk of the cases of domicil reported in the American books are cases of statutory residence. This is especially true with regard to the subjects of voting, eligibility to office, taxation, jurisdiction in divorce, probate and administration, etc. *With respect to these subjects there is substantial unanimity in this country in holding statutory residence to mean domicil.* In cases of pauper settlement, limitations, etc., there is much conflict of opinion, and in those of attachment the weight of authority is the other way."

M. W. Jacobs, *A Treatise on the Law of Domicil* § 75, 123-25 (1887) (emphasis added; footnotes omitted). That is, although in other legal contexts residence might be given a different or looser meaning, in the context of political or electoral rights, "residence" meant "domicile." As to voting, Thomas

Cooley's treatise likewise took the position that "[t]he words 'inhabitant,' 'citizen,' and 'resident,' as employed in different constitutions to define the qualifications of electors, mean substantially the same thing; and one is an inhabitant, resident or citizen at the place where he has his domicile or home." Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 600 (1st ed 1868).

That described consensus is also reflected in commentary on Article II, section 1, of the United States Constitution, which imposes a 14-year residency requirement for the office of President. Like Article V, section 2, of the Oregon Constitution, that requirement is expressed using the words "Resident within."[2] Joseph Story, in his commentary, equated that particular residency requirement to domicile, explaining that

> "[b]y 'residence,' in the constitution, is to be understood, not an absolute inhabitancy within the United States during the whole period; but such an inhabitancy, as includes a permanent domicil in the United States. \*\*\* The true sense of residence in the constitution is fixed domicil[.]"

Joseph Story, 3 *Commentaries on the Constitution of the United States* 333-34 (1833).

Cases from around the time when Oregon's constitution was adopted that interpreted residency requirements for public office or for voting consistently viewed such requirements, insofar as they used the term "resident," to refer to domicile. *See People ex rel. v. Connell*, 28 Ill App 285, 291 (1888) (interpreting the Illinois Constitution's durational residency requirement for judges to require domicile); *Yonkey v. State*, 27 Ind 236, 245-46 (1866) (equating residency requirement for municipal officials contained in Article VI, section 6, of the Indiana Constitution with domicile);[3] *Opinion of the*

---

[2] In pertinent part, it provides:

"No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States."

US Const, Art II, § 1.

[3] Relator attempts to rely on two different Indiana cases, *Pendleton v. Vanausdal*, 2 Ind 54 (1850), and *French v. Lighty*, 9 Ind 475 (1857), *overruled in*

*Justices*, 46 Mass 587, 588 (1843) (holding that "inhabitant" and "one who has resided" "are equivalent to the familiar term domicil, and therefore the right of voting is confined to the place where one has his domicil, his home or place of abode"); *Roberts v. Cannon*, 4 Dev & Bat 256, 269, 20 NC 398 (1839) ("It may not be amiss to remark, that by a residence in the county, the Constitution intends a *domicil* in that county." (Emphasis in original.)); *People v. Platt*, 117 NY 159, 167, 22 NE 937, 938 (1889) (in the context of a residency requirement for an office, stating that, "in all cases where a statute prescribes 'residence' as a qualification for the enjoyment of a privilege or the exercise of a franchise, the word is equivalent to the place of domicile of the person who claims its benefit"); *Chase v. Miller*, 41 Pa 403, 420-21 (1862) (when the legislature has not "attached to the word any other than its ordinary legal signification, it is to be received according to its primary meaning in the constitution, as equivalent to domicil"); *see also State v. Hallett*, 8 Ala 159, 161 (1845); *Dale v. Irwin*, 78 Ill 170, 181-82 (1875); *Vanderpoel v. O'Hanlon*, 53 Iowa 246, 248-49, 5 NW 119, 120 (1880); *Blanchard v. Stearns*, 46 Mass 298, 303-04 (1842); *Opinion of Justices*, 7 Me 497, 501 (1831); *State ex rel. Hannon v. Grizzard*, 89 NC 115, 120 (1883)

Early interpretations of Article II, section 2, of the Oregon Constitution took the same approach. As noted above, this court treated the residency requirement in that provision, which required a person to have "resided in" Oregon to be eligible to vote, as equivalent to domicile in *Wood*, which was decided in 1870.[4] 3 Or at 573. In 1872, the legislature, to provide guidance to local elections officials,

---

part by *Pittsburgh, Ft. W. & C.R. Co. v. Gillespie*, 158 Ind 454, 63 NE 845 (1902). *Pendleton* is a case about service of process and is not germane to the meaning of residence in the context of requirements for officeholding. The Indiana Supreme Court's decision in *French* says nothing pertinent to this issue; relator appears to rely on an abstract of a trial court opinion that is quoted in a footnote, but nothing in that lower court opinion is inconsistent with construing residence to mean domicile. *See French*, 9 Ind at 477 n 1 ("The word 'home,' is nearly synonymous with the word 'domicile.' A residence, within the meaning of our constitution, is a home.").

[4] Although not on the subject of political rights, the Territorial Supreme Court had, shortly before ratification, interpreted the words "residing upon," as used in the Donation Land Act, to refer to domicile. *Lee v. Simonds*, 1 Or 158, 159-60 (1854).

enacted a set of rules to be used in determining residence for voting purposes:

> "The Judges of Election, in determining the residence of persons offering to vote, shall be governed by the following rules, so far as the same may be applicable:
>
> "First—That place shall be considered and held to be the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.
>
> "Second—A person shall not be considered or held to have lost his residence who shall leave his home and go into another State or Territory or county of this State for a temporary purpose only, with an intention of returning.
>
> "Third—A person shall not be considered or held to have gained a residence in any county of this State into which he shall come for temporary purposes merely, without the intention of making said county his home, but with the intention of leaving the same when he shall have accomplished the business that brought him into it.
>
> "Fourth—If a person remove to any other State or to any of the Territories, with intention of making it his permanent residence, he shall be considered and held to have lost his residence in this State.
>
> "Fifth—The place where a married man's family resides shall be considered and held to be his residence.
>
> "Sixth—If a person shall go from this State into any other State or Territory and there exercise the right of suffrage, he shall be considered and hold to have lost his residence in this State."

Or Laws 1872, p 40, § 3. That statutorily enacted interpretation of Article II, section 2, again adhered to the legal concept of domicile and makes clear that, as a statutory matter, a person's residency for voting purposes could be acquired or lost only through establishing a permanent residence. We owe no special deference to legislative enactments when interpreting the Oregon Constitution, but that law—enacted within two decades of ratification and embodying an interpretation of the constitution[5]—provides further evidence of

---

[5] With minor amendments, those criteria have remained part of our law for 150 years. Now directed to the Secretary of State, they are codified at ORS 247.035.

how residency requirements connected to political rights and qualifications were understood at the time.

Legal authorities, court decisions, historical context, and the earliest interpretations of constitutional residency requirements by this court and the legislature concur on the point that, in the nineteenth century and in the context of political rights—and election-related rights in particular—"residence" meant "domicile," the one place where a person has established his or her permanent abode. We therefore conclude that, for purposes of Article V, section 2, "resident within" refers to domicile.

B.   *Application to this Case*

Having construed the term "resident within" in Article V, section 2, we turn to its application in this case. Through his petition, relator has asked us to issue a peremptory writ of mandamus to the secretary, directing her to accept his declaration of candidacy and to have his name placed on the ballot. "A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station[.]" ORS 34.110. The availability of that relief to relator therefore depends on his ability to show that the secretary had a duty to accept his declaration of candidacy.

Ordinarily, "the Secretary of State has a ministerial duty to accept a declaration of candidacy regular on its face," but she may reject declarations when the candidate will not be qualified to take office. *Pense v. McCall*, 243 Or 383, 393, 413 P2d 722 (1966). ORS 249.031(1)(f) requires declarations of candidacy to include "[a] statement that the candidate will qualify if elected." And ORS 249.004(1) provides that "[a] filing officer may verify the validity of the contents of the documents filed with the officer under this chapter."[6] This court has previously held that the secretary's authority to verify filings "would be meaningless if it was not contemplated that he would take action if facts became known to him which show that the candidate is unqualified." *McAlmond v. Myers, Corbett*, 262 Or 521, 525, 500 P2d

---

[6]  The Secretary of State is the filing officer for state offices. ORS 254.165(3)(b)(A).

457 (1972). As much is confirmed by ORS 254.165(1), which directs that,

> "[i]f the filing officer determines that a candidate has died, withdrawn or become disqualified, *or that the candidate will not qualify in time for the office if elected*, the name of the candidate may not be printed on the ballots or, if ballots have already been printed, the ballots must be reprinted without the name of the candidate before the ballots are delivered to the electors."

(Emphasis added.) That is, the legislature has accorded the secretary the responsibility of determining, in the first instance, whether a prospective candidate is qualified to appear on the ballot.

As we have explained, to satisfy Article V, section 2, a candidate for governor in the 2022 election must have been domiciled in Oregon in the "three years next preceding" the November 2022 general election—in other words, the time period running from November 2019 to November 2022. "Every person is assumed by the law to have one domicile and one only," and a domicile, once established is "presumed to have continued until it is shown that a new one was established." *Reed's Will*, 48 Or at 505. There is no dispute that relator was at one point domiciled in Oregon, starting from when he moved here at the age of 12. Whether relator was domiciled in Oregon in November 2019 therefore turns on two distinct questions: whether relator ceased to be domiciled in Oregon at any point and, if so, whether he regained an Oregon domicile by November 2019.

"To constitute domicile there must be both the fact of a fixed habitation or abode in a particular place, and an intention to remain there permanently or indefinitely[.]" *Reed's Will*, 48 Or at 504. For that reason, as relator properly notes, a long period of absence from Oregon is not, in and of itself, dispositive of the question of domicile. In *Reed's Will*, for example, we held that the decedent, who had previously been domiciled in Oregon, did not lose that domicile despite living in California for over a decade. *Id.* at 505. A person's original domicile, once established, continues until there is "an intention, expressed or implied, to abandon the old domicile and acquire a new one." *Id.* at 508; *see also id.*

("Within the principle of law declared in the decisions, a person may reside for pleasure or health in one place without forfeiting or surrendering his domicile or legal residence in another, if he so intends.").

For that reason, the ultimate legal question of relator's domicile necessarily turns on subsidiary factual findings about relator's intent. That affects the standard under which we review the secretary's determination. Although mandamus relief is appropriate in "a situation where a right is inferable as a matter of law from uncontroverted facts," *State ex rel Maizels v. Juba*, 254 Or 323, 330, 460 P2d 850 (1969), we have not held that mandamus can be used to challenge an official's findings of fact. In the context of writs of mandamus directed to lower courts, we have explained that, "'[a]s a general rule, mandamus lies to require inferior courts to act, but it will not compel them to decide disputed questions of fact in a particular way.'" *State ex rel Ware v. Hieber*, 267 Or 124, 128, 515 P2d 721 (1973) (quoting *State ex rel. v. Crawford*, 159 Or 377, 386, 80 P2d 873 (1938)). In *Ware*, we concluded that "our function is to decide whether there was any evidence to substantiate the circuit court's ruling." *Id.* at 127-28.

In the context of writs of mandamus directed to public officials, we have stated that a writ of mandamus can be used "to compel the execution, by a public officer, of a duty prescribed by law, but not to control the exercise of that duty, when the act to be done involves the exercise of judgment or discretion." *State ex rel. v. Siemens*, 68 Or 1, 8, 133 P 1173 (1913). Put differently, "[i]f *mandamus* shall lie in this cause, it must appear from the record that the relator possesses a clear, legal right to the thing demanded, and it must be the imperative duty of the Secretary of State to perform the act so demanded." *Putnam v. Kozer*, 119 Or 535, 541, 250 P 625 (1926) (emphasis in original). Here, in assessing the secretary's application of the constitutional standard for residency, our task is not to conduct our own review of the facts; rather, it is to decide whether the evidence in the record, assessed under the correct legal standard, would have *compelled* a decision in relator's favor. Only that would entitle him to a writ of mandamus directing the secretary

to determine that he met the durational residency requirement set out in Article V, section 2.[7]

In determining relator's intent, the secretary applied the correct legal standard. In *Elwert v. Elwert*, 196 Or 256, 268-69, 248 P2d 847 (1952), we laid out some general principles for discerning intent in cases where a person has a connection to multiple places, and many of those principles are relevant here:

> "The nature and location of a party's business with reference to his residence is an element for consideration. In general, it is held that merely being engaged in business, even on a large scale, in a state or municipality other than that in which one's family resides does not justify the claim of legal residence at the business location. The retention of an interest in a business in the locality from which one has removed weakens the proof of abandonment and requires some explanation. Evidence that the *main* place of a man's business is at the place from which he came may be indicative of an intention to maintain his domicil in that locality. If he has two residences, his domicil will be presumed to be the one which appears to be the center of his affairs. Therefore, one who has resided and carried on business for years in one jurisdiction cannot for his own purposes insist that his domicil is in another. The facts may belie the expressed intent to retain a domicil actually given up. The original domicil is favored and where the facts are conflicting, the presumption is strongly in favor of an original or former domicil as against an acquired one."

196 Or at 268-69 (emphasis in original; citations omitted).

The secretary determined that, although relator was domiciled in Oregon in 1971, he moved to and became domiciled in New York in the early 2000s at the latest and, therefore, that he ceased to be a "resident within this State"

---

[7] Relator has not requested this court to direct the secretary to reconsider his filing in light of additional information, nor has he sought an opportunity to present additional evidence to either the secretary or to this court. The only relief that he has sought is for us to direct the secretary to accept his filing. The question before us, therefore, is whether, on this record, he is entitled to that relief. *See Sears v. Kincaid*, 33 Or 215, 219, 53 P 303 (1898) (noting that "great care is required in stating in the writ the particular thing commanded to be done, in order that the party to whom it is directed may know the precise duty to be performed, and because the writ must be enforced in the terms in which it is issued or not at all").

at that time. In support of that view, she points to relator's New York voter registration and New York driver's license, the fact that he had purchased a home in New York, the fact that he spent most of his time in New York, and the fact that he paid income taxes exclusively in New York during that period. Though acknowledging relator's statement that he still considered Oregon his home, the secretary noted that she "cannot ignore past acts that strongly indicate the person's state of mind at that time, even if the person's current sworn statement indicates a different intent."

The secretary's decision on that point considered evidence that this court has recognized as probative of a person's intent to indefinitely remain. We have recognized the significance of where a person maintains a driver's license, *Elwert*, 196 Or at 269-70;[8] the amount of time that a person spends in a place, *Zimmerman v. Zimmerman*, 175 Or 585, 591-92, 155 P2d 293 (1945); and where a person pays income taxes, *Elwert*, 196 Or at 269.

Relator disputes the weight that the secretary attached to his New York voter registration, arguing that voter registration is a "ministerial act" that reveals little about his connection to Oregon. In at least two cases, however, this court has considered where a person voted as evidence of domicile. *See Rodda v. Rodda*, 185 Or 140, 200 P2d 616 (1948); *Kelley v. Kelley*, 183 Or 169, 184, 191 P2d 656 (1948). It is true that, in an earlier case, this court largely discounted the significance of where the person voted. *Miller v. Miller*, 67 Or 359, 136 P 15 (1913). But, in that case, the court's reasoning was, in part, that, "[c]onsidered in connection with the defendant's previous registration in Oregon, his voting in Idaho savors strongly of a self-serving declaration, and as such is of no consequence." *Id*. at 366-67. That consideration does not apply here. And the legal principle that voting sheds significant light on one's place of domicile

---

[8] In ascribing significance to that fact, we observe that, "[u]nless otherwise specifically provided by law, a person who is a resident of this state may not operate a motor vehicle in this state unless the person receives a driver license or permit from the Department of Transportation." ORS 807.062(2). ORS 807.020(1) permits nonresidents, along with any person "who has been a resident of this state for less than 30 days" to drive with a valid out-of-state driver's license.

is longstanding and predates the ratification of Article V, section 2. Joseph Story wrote that,

> "if a married man has two places of residence at different times of the year, that will be esteemed his domicil, which he himself selects, or describes, or deems, to be his home, or which appears to be the centre of his affairs, or where he votes, or exercises the rights and duties of a citizen."

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* 45 (2d ed 1841). And the Supreme Court has held that,

> "[o]n a change of domicile from one State to another, citizenship may depend upon the intention of the individual. But this intention may be shown more satisfactorily by acts than declarations. An exercise of the right of suffrage is conclusive on the subject; but acquiring a right of suffrage, accompanied by acts which show a permanent location, unexplained, may be sufficient."

*Shelton v. Tiffin et al.*, 47 US 163, 185, 12 L Ed 387 (1848).

We think it important, though, to explain the reason that the secretary did not commit legal error in attaching such significance to voting. Relator's characterization of voter registration as ministerial is mistaken. Although registering to vote may *involve* paperwork or other ministerial tasks, the choice of where to register is a meaningful one, as it provides evidence of the political community to which a person feels the greatest attachment—the community in whose elections that person wishes to have a say. We observe that the basis for the secretary's decision was *not*, in and of itself, that relator failed to register to vote in Oregon. Neither Article V, section 2, nor the doctrine of domicile requires that a person register to vote in a jurisdiction. Many people who are domiciled in Oregon are not, and may never have been, registered to vote. What the secretary found significant is that relator registered to vote in a different state and cast ballots in that other state's elections over a period of two decades.

Relator also faults the secretary for discounting his continuing connections to Oregon, which included managing land that he owned. As we explained in *Elwert*, although those facts weighed to some extent against finding that

he had changed his domicile to New York, "merely being engaged in business, even on a large scale, in a state or municipality other than that in which one's family resides does not justify the claim of legal residence at the business location." 196 Or at 268. More pertinent is that relator's main occupation, as a journalist working for the New York Times, was centered in New York. *See id.* ("Evidence that the *main* place of a man's business is at the place from which he came may be indicative of an intention to maintain his domicil in that locality." (Emphasis in original.)).

Applying the correct understanding of the "resident within" requirement in Article V, section 2, the secretary relied on evidence probative of where relator was domiciled during a period of two decades and determined that the evidence established that relator ceased to have an Oregon domicile and became domiciled in New York. Under the appropriate standard for issuing a peremptory writ, we cannot conclude that the secretary was compelled to find that relator remained domiciled in Oregon, nor can we conclude that the secretary was legally required to lend greater significance to relator's identification of Oregon as his home. *See generally Elwert*, 196 Or at 269 ("The facts may belie the expressed intent to retain a domicil actually given up.").

We turn to the secretary's determination that relator had not reestablished his domicile in Oregon by November 2019. The record again supports that decision. During 2018 and 2019, relator began spending more time in Oregon, began leasing the family farm, and took increased responsibility for the operation of the farm. That evidence could lend at least some support to the view that relator began to shift the center of his affairs to Oregon before November 2019.

However, as the secretary noted, the record contains countervailing evidence concerning relator's intent. He remained registered to vote in New York and retained a New York driver's license until late 2020, actions that are at odds with an intent to change his domicile to Oregon a year or more earlier. Relator continued to physically reside primarily in New York during 2018 and 2019, and his affidavit is nonspecific about precisely how much time he spent in Oregon in those years and in 2020. In addition, relator's

stated reason for spending more time than usual in Oregon was to work on a book about Yamhill County, a temporary project, while relator retained his employment at the New York Times. *See Elwert*, 196 Or at 268 ("Evidence that the *main* place of a man's business is at the place from which he came may be indicative of an intention to maintain his domicil in that locality." (Emphasis in original.)). Moreover, as the secretary's decision letter noted, relator's affidavit did not contain any detail about whether his farm management responsibilities required him to spend more time in Oregon or whether he handled them primarily from New York. *See id.* at 269 ("The original domicil is favored and where the facts are conflicting, the presumption is strongly in favor of an original or former domicil as against an acquired one."). Given the objective evidence in the record of relator's continued presence in and related connections to New York in 2019 and 2020, and the limited detail on key components of his ongoing connections to Oregon, the secretary was not compelled to find that, as of November 2019, relator had reestablished his residence in Oregon and intended that Oregon, not New York, be the state in which he would reside indefinitely or, ultimately, to conclude that relator had changed his domicile to Oregon.

C.  *Relator's Federal Constitutional Challenge to Article V, Section 2*

We turn to relator's final argument, which is that Article V, section 2, as we have construed it above, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Relator rests this claim on a contention that the durational residency requirement set out in Article V, section 2, infringes on the right to vote and the right to interstate travel. Because it interferes with those constitutional rights, relator maintains, the three-year durational residency requirement is subject to strict scrutiny, requiring the state to show that it is narrowly tailored to advance a compelling state interest. *Adarand Constructors, Inc. v. Pena*, 515 US 200, 227, 115 S Ct 2097, 132 L Ed 2d 158 (1995) (describing strict scrutiny). Relator does not dispute that a durational residency requirement for holding public office serves compelling state interests;

indeed, he concedes that such requirements "survive strict scrutiny when tailored to the purposes they aim to advance." He argues only that, compared to the alternatives, the domicile requirement imposed by Article V, section 2, is unnecessarily restrictive.

The secretary contests relator's premise that Article V, section 2, is subject to strict scrutiny. She argues that Article V, section 2, does not burden either the right to vote or the right to travel, and that it is therefore subject only to rational-basis review. The secretary argues that the durational residency requirement is "rationally related to the interest in ensuring that officeholders know Oregon and have a stake in Oregon's civic life," as well as an interest in allowing voters to observe "the character, experience, and views" of potential governors.

We do not reach the merits of relator's claim. Even assuming that relator is correct that the durational residency requirement in Article V, section 2, is subject to strict scrutiny, we conclude that relator's claim is not one that can properly be addressed by this court in mandamus. As we have emphasized above, a writ of mandamus is appropriate only to compel a public official to perform a clear duty. Although mandamus can be used to decide a novel legal question, as we have done in this case, we have explained that it will only rarely unsettle a public official's findings of fact. The question of narrow tailoring for strict scrutiny purposes, however, will frequently rest on factual as well as legal determinations. *See Turner Broadcasting Systems, Inc. v. FCC*, 512 US 622, 665, 114 S Ct 2445, 129 L Ed 2d 497 (1994) (plurality opinion) (concluding that, "[o]n the state of the record developed thus far, and in the absence of findings of fact from the District Court, we are unable to conclude that the Government has satisfied" a narrow tailoring requirement). Here, relator's claim that the durational residency requirement contained in Article V, section 2, is not narrowly tailored to its goals implicates questions with factual components, including how well the durational residency requirement actually serves its intended purposes, the administrability of relator's proposed alternative, and whether that alternative would serve those purposes

equally well. Relator emphasizes that, "[u]nder strict scrutiny, the government has the burden of proving that [challenged restrictions] 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 US 499, 505, 125 S Ct 1141, 160 L Ed 2d 949 (2005) (quoting *Adarand Constructors, Inc.*, 515 US at 227). But it is precisely that feature of strict scrutiny that makes this claim inappropriate for this court's original mandamus jurisdiction, where the secretary has not had the opportunity to develop a record capable of sustaining that burden. *See Fredrickson v. Starbucks Corp.*, 363 Or 810, 814, 429 P3d 727 (2018) (denying a mandamus petition because "the parties' disagreements are better resolved through proceedings where those arguments can be fully developed, rather than through the limited jurisdiction afforded in a mandamus proceeding").

We therefore decline to consider relator's Equal Protection Clause challenge in mandamus, and so we deny relator's mandamus petition insofar as it seeks to compel the acceptance of his declaration of candidacy on the basis of a conclusion that Article V, section 2, is unconstitutional. *State v. Blok*, 352 Or 394, 400, 287 P3d 1059 (2012) ("This court's exercise of its mandamus power is discretionary."). That does not mean that the courthouse doors are closed to consideration of this claim, just that it is not suited to the extraordinary legal remedy of mandamus.

### III.   CONCLUSION

We recognize that relator has longstanding ties to Oregon, that he owns substantial property and operates a farm here, and that the secretary did not question his current Oregon residency. Moreover, he has thought deeply and written extensively about the challenges faced by those living in rural areas of Oregon—and the rest of the country. But that is not the issue here. The issue, instead, is whether relator has been, during the three years preceding the November 2022 election, "a resident within this State." For the reasons set out above, we conclude that the secretary was not compelled to conclude, on the record before her, that relator satisfied that requirement.

The alternative writ of mandamus is dismissed, and the petition for writ of mandamus is denied. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the appellate judgment on February 23, 2022, unless a petition for reconsideration is electronically filed by 5:00 p.m. on February 22, 2022. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 5:00 p.m. on February 24, 2022. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.