No. 30        August 15, 2024        695

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Adverse Party,*

*v.*

QUENTIN PERNELL BLACKMON,
aka Quentin Blackmon, aka Quenton Blackmon,
*Defendant-Relator.*

(CC 20CR58447) (S070836)

En Banc

Original proceeding in mandamus.*

Argued and submitted July 9, 2024.

Laura Graser, Portland, argued the cause and filed the briefs for relator.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for adverse party. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

BUSHONG, J.

The petition for a writ of mandamus is denied.

_____
    * On petition for alternative writ of mandamus from an order of Multnomah County Circuit Court, Kelly Skye, Judge.

**BUSHONG, J.**

Relator has twice gone to trial on serious felony charges; both trials ended in mistrials. After the second mistrial—declared because a courtroom clerk had given the jury an exhibit that disclosed relator's prior felony conviction, which had been excluded from the jury's consideration—relator moved to dismiss the charges with prejudice. Relator contended that a retrial was barred by the former jeopardy provision in Article I, section 12, of the Oregon Constitution,[1] as interpreted by this court in *State v. Kennedy*, 295 Or 260, 276, 666 P2d 1316 (1983) (holding that Article I, section 12, bars a retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal"). After hearing testimony, the trial court denied relator's motion, concluding that it could not make a finding of "indifference" under the *Kennedy* test.[2] Relator sought a writ of mandamus from this court, contending that the circumstances here barred a retrial and compelled dismissal with prejudice under *Kennedy*.

We set an expedited schedule for briefing and argument, and we now decline to issue the writ. The trial court did not make the findings that would have required dismissal with prejudice under *Kennedy*, and the record—discussed in detail below—did not compel those findings. Specifically, the record did not compel findings that (1) the clerk had knowingly allowed the jury to consider the prohibited exhibit, knowing that it disclosed relator's prior conviction; and (2) the clerk had acted with indifference to the consequences. Accordingly, we conclude on this record that Article I, section 12, does not bar a retrial in this case.[3]

---

[1] Article I, section 12, provides that "[n]o person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself."

[2] The trial court did not make a specific finding on part of the *Kennedy* test: whether the clerk knew that her conduct was improper and prejudicial.

[3] Our conclusion is based on the record created on defendant's pretrial motion to dismiss and the trial court's findings to date, and it does not preclude a different conclusion if any further proceedings in this case lead to different or additional findings. Our opinion here neither requires nor precludes further proceedings on this issue.

# I.   BACKGROUND

## A.   *The First Mistrial*

Relator—who previously had been convicted in a single judgment of a felony and two misdemeanors—was indicted on charges of second-degree murder, unlawful use of a weapon, and felon in possession of a firearm. He waived his right to a jury trial on the felon-in-possession charge; accordingly, his prior felony conviction (establishing his status as a felon) should not have been disclosed to the jury. The case proceeded to a jury trial on the first two counts. During opening statement, the prosecutor asked the jury to convict on those charges and also on the charge of felon in possession of a firearm. Relator immediately objected and moved for a mistrial, and the trial court granted that motion. Relator then filed a motion to dismiss all charges with prejudice under *Kennedy*, 295 Or 260.

The trial court denied that motion, concluding that the prosecutor had made "a grave mistake" but that the prosecutor had not known that his conduct was improper and had not intended to cause a mistrial, nor had he been indifferent to causing a mistrial. That ruling is not presently before us, but it does provide relevant context for the clerk's actions on retrial, which commenced about three months after the first mistrial. The same trial judge presided over the second trial, assisted by the same clerk.

## B.   *The Second Mistrial*

On retrial, the first two counts were again tried to a jury, and the felon-in-possession charge was again tried to the court. At the conclusion of the trial, the case was submitted to the jury on the first two counts. After several days of deliberations, the jury informed the court that it could not agree on a verdict. The court declared a mistrial due to the deadlocked jury, and the parties planned to retry the case.

Almost three months after the court had declared a mistrial due to the deadlocked jury, juror 6 contacted relator's trial counsel. The juror explained that, after the mistrial, he had conducted an internet search and had learned about the first mistrial and the fact that it had been caused

by the prosecutor telling the first jury that relator had a prior felony conviction. Juror 6 remembered that the jury in the second trial had seen and discussed an exhibit that had revealed relator's prior felony conviction, and he thought that that may have been inappropriate.[4] That led him to contact relator's trial counsel.

Relator's trial counsel then filed a motion, supported by a declaration from juror 6, to change the basis for the second mistrial from a deadlocked jury to the erroneous submission of an exhibit that had informed the jury about relator's prior felony conviction. In his declaration, juror 6 stated that, during deliberations, he had seen a document showing that relator had been previously convicted of a felony and that the jury had discussed that prior conviction during its deliberations. Juror 6 further stated that he had asked the foreperson if he would question the court about the document, but juror 6 did not know if the foreperson had ever brought it to the court's attention, and, if so, what the court's response had been.

The trial court granted relator's motion to change the basis for declaring a mistrial after hearing testimony from the clerk. The clerk's testimony is summarized in more detail below. The court entered an order declaring that the second mistrial was required in part because the clerk had given the jury an exhibit that documented relator's prior felony conviction, and that such evidence had been previously excluded from the jury's consideration. The court also granted a request from relator to contact other jurors, and it scheduled another hearing.

Shortly thereafter, the court heard testimony in two separate hearings from juror 5 (the jury foreperson), juror 49, and the clerk's supervisor. Based on that testimony, the declaration from juror 6, and the clerk's prior testimony, relator moved to dismiss the charges with prejudice. After

---

[4] The parties agree that the exhibit in question was a copy of the judgment entered in *State v. Blackmon*, Multnomah County Circuit Court Case No. 080532136, which was entered in the register on October 9, 2008. That judgment showed that relator had been convicted in that case of second-degree robbery (a Class B felony), and two misdemeanors: third-degree theft and fourth-degree assault.

another hearing, the trial court denied that motion. Relator then filed a petition for mandamus relief in this court.

## C.   *Summary of the Record*

The record created in the trial court and the court's findings inform our resolution of relator's mandamus petition. Accordingly, we set forth that record and the court's findings in some detail below, beginning with the first hearing on relator's motion to change the basis for declaring the second mistrial.

### 1.   *First hearing (September 7, 2023)*

At the first hearing, the clerk testified that, at the beginning of the jury deliberations, she had presented to the jury a "significant stack of documents" and a "flash drive with a very large PowerPoint on it" that had around "40 or 50 slides." She stated that she did not "recall any particular exhibit," and that she did not "have a specific memory" of giving the jury an exhibit that disclosed relator's prior convictions. She further testified that she had asked counsel for both sides to "look through exhibits" and that she had given them to the jury after she had received "the okay from both sides."

The clerk acknowledged that she had been aware that relator had waived his right to a jury trial on the felon-in-possession charge and that relator's prior felony conviction therefore should not have been disclosed to the jury. She testified that she did not "have a specific memory" of segregating out an exhibit that showed relator's prior conviction when she gave the exhibits to the jury; instead, she testified that her "only memory" was that she had the exhibits that were meant to be submitted to the jury, and that she had asked both attorneys to check the exhibits "to make sure everything was good to go" before giving them to the jury. When asked if any of the jurors had contacted her to discuss a concern that the jury had expressed about an exhibit, the clerk testified that she thought at one point that a juror had "noticed that one of the documents didn't have an exhibit sticker," but the clerk stated further that she had gone over the exhibits, noticed that the prosecutor had "just forgotten to put an exhibit sticker on one," brought that to

the prosecutor's attention, and ultimately concluded that all the exhibits had been "good to go to the jury." The clerk did not connect the discussion about a document that was missing an exhibit sticker with the exhibit that showed relator's prior convictions.[5]

The clerk further testified that she had not taken any action to try to influence the verdict in any way, nor had she ever (1) commented on the evidence to the jury; (2) showed the jury evidence that it was not supposed to have; or (3) felt any bias towards relator or desire to assist the state in its prosecution. Relator's trial counsel stated at that time that it reserved cross-examination for a later date because counsel had not expected the clerk to testify at that hearing. But the clerk did not appear at any subsequent hearing, so relator's trial counsel never cross-examined her.

After the clerk testified, the trial court addressed the parties, stating that, when the clerk had been out of the office, a notebook "stuffed with paperwork that appeared to be exhibits from various trials" had been discovered at the clerk's workstation. The court and the clerk's supervisor reviewed that paperwork and found, among other things, the exhibits from relator's trial, including the exhibit showing relator's prior conviction, which had a state's exhibit sticker without an exhibit number. All the other exhibits from relator's trial had exhibit stickers with numbers. The court stated that it was "convinced" at that point that what juror 6 had stated in his declaration about seeing an exhibit disclosing relator's prior convictions was "correct." The court then clarified that it was declaring a mistrial not just because of the deadlocked jury, but also because the jury had been "given access to evidence that [the jury] shouldn't have received." As noted earlier, the court then granted a request from relator to contact other jurors, and it scheduled another hearing.

---

[5] The photocopy of the judgment showing relator's prior felony conviction that was included in the excerpts of record shows that the judgment was stamped as "filed" and "entered" by the court on October 9, 2008. The photocopy shows a copy of the original "State's Exhibit" sticker (unmarked) at the top of the document; in the lower-right hand corner, the document has an Exhibit sticker marked "Court 4" without identifying a party. Relator contends that the "Court 4" exhibit sticker was affixed to the document at a hearing after the second trial in this case; the state does not dispute that contention.

2.   *Second hearing (September 18, 2023)*

At the second hearing, the presiding juror (juror 5) testified that he could not recall whether the jury had received the exhibits when it began deliberating after closing arguments, but he knew that the jury had all the "digital stuff" and the "physical copies" of exhibits by the morning of the second day of deliberations. The juror recalled that the jury had "passed *** out" the physical exhibits one at a time so that each juror could review each exhibit. According to juror 5, by the end of the day, "everyone had a look at the documents they needed to look at."

Regarding the exhibit at issue, juror 5 testified that, "if [his] memory serve[d] [him] correctly, it was not an entire transcript of [relator's] criminal history." Rather, the exhibit had showed something "like, some carjacking or *** [something] seemingly unrelated to anything" that had been discussed during the trial. Juror 5 stated that he "didn't really perceive it as relevant to the deliberation," considering it as "more of a background" about relator. Juror 5 also recalled that that exhibit "wasn't marked the same as the others, but it did have a court marking on it, *** like a stamp." He said that a female juror, juror 49, had "pointed [the exhibit] out and said, 'That's marked differently.'"

Juror 5 next testified that he did not recall discussing that exhibit with the clerk, but he thought that juror 49 had asked the clerk about that exhibit. Juror 5 explained that juror 49 had "interacted with" the clerk, stating that juror 49 had "asked about the documents" and had "verified" that the jury was supposed to have them. Juror 5 further explained that the inquiry from juror 49 had occurred because the exhibit that had been marked differently "looked kind of out of place." That conversation occurred in front of the other jurors; juror 5 stated that he believed that the clerk had "reviewed [the exhibit] to make sure it had the right stamps on it." Juror 5 did not remember if anyone took the exhibit out of the jury room, but stated that, if that had happened, it would not have left the room for more than five minutes. When asked how the clerk had responded when juror 49 had inquired about that exhibit, juror 5 stated that

he did not recall the clerk's exact response but stated that it did not "strike" him as "anything out of the ordinary."

Juror 5 also testified that the discussion about the exhibit may have "prompted" him to write a note to the trial court at the request of juror 49, but the note had not specifically asked about the exhibit that disclosed relator's prior felony conviction. Instead, the note had asked a more general question: "Is there any additional information that can be shared with us, the jury, about [relator's] initial arrest leading up to the grand jury?" Juror 5 explained that he wrote that question because juror 49 wanted an explanation about why the police had arrested relator in the first place. The court had responded to the note in writing, stating, "You have all of the evidence that you may consider."

Juror 5 further testified that the jury had "never discussed anything about the case" with the clerk. He testified that the jury had deliberated with the door closed and without the clerk in the room, and that the clerk would knock on the outside door before entering. Juror 5 also testified that, whenever the jury had a question, the clerk did not "weigh in" herself; instead, the clerk would typically say, "Let me go get the judge," or "write it down so I can fold it up and give it to the judge," and that the judge would respond to the jury's question. When asked if he had any concern about "the propriety" of any of the clerk's actions or interactions with the jury, juror 5 responded, "No," stating that he and "everyone else" on the jury had felt that the trial was handled "with the utmost professionalism by the Court."

After juror 5 was excused, the trial court again explained on the record that the exhibit disclosing relator's prior convictions had been found with other exhibits from relator's trial in a notebook in a drawer at the clerk's workstation. The clerk's supervisor testified at the hearing that there had been "several instances" when the judge in this case and her judicial assistant had contacted her about the clerk's "cleanliness in the courtroom and some of her disorganization." The supervisor further testified that she had discussed the matter with the clerk on several occasions, but that both the supervisor and the judge had continued to "find strewn papers on [the clerk's] desk."

According to the supervisor, the exhibit at issue in this case had been discovered at the clerk's desk when the clerk was out of the office. The supervisor explained that she had found exhibits and motions for this case, along with exhibits for three other cases, among the documents in the notebook that had been found in the clerk's desk. Those documents had not been segregated by case, but the documents relating to each case had been "clumped together reasonably well." The supervisor testified that she had organized and processed the exhibits for the three other cases, but that the exhibits for this case had "left [her] in a conundrum," so she put a sticky note on the exhibits telling the clerk that she needed to process them. Two weeks later, the supervisor found the trial exhibits still sitting on the clerk's desk. The supervisor then contacted the judge, and they started the process for terminating the clerk's employment.

The supervisor also described the proper procedure for processing exhibits after a trial. She testified that, in general, if a criminal defendant is found guilty, the clerk is supposed to file all the exhibits with the court's records department. If a defendant is acquitted or if the court declares a mistrial, the clerk is supposed to return all exhibits to the parties. And regardless of the outcome, the clerk is always supposed to fill out a form—commonly known as an "exhibit log" or "log sheet"—that lists each exhibit that had been offered and whether the exhibit had been received. The attorneys typically sign the log sheet, and the clerk then files it with the court's records department. The supervisor testified that she had not found the required log sheet for this case, although the clerk had filed log sheets for other cases.

3. *Third hearing (September 28, 2023)*

Juror 49 testified at the third hearing that she "remember[ed] seeing something in the evidence that felt like it was an old charge." She further testified that a different juror—likely a male juror, but she was not sure—had discussed that exhibit with the clerk. She did not specifically recall the clerk's response, but she thought that the clerk "would have said something like, *** 'I'll bring this to the Court's attention.'" Juror 49 testified that she had not seen the clerk or anyone else leave the jury deliberation room

with the exhibit that had been called to the clerk's attention. Juror 49 further testified that she had asked juror 5 to write a note to the court asking for more information about relator's arrest, but that the note did not have anything to do with the exhibit that disclosed relator's prior conviction.

### D. *The Trial Court's Findings*

The trial court heard further argument and made findings on the record at a fourth hearing. The court began by stating that it found that the clerk's testimony at the first hearing had not been credible. The court clarified that, when the clerk testified that she had checked with the attorneys for both parties about the exhibits and that the attorneys had approved them before she had given them to the jury, that testimony had not been credible. If the clerk had checked with the attorneys, the court explained, the court was "confident" that both attorneys would have noticed the exhibit showing relator's prior convictions. The court also stated that it did not believe that the clerk had brought the exhibit without an exhibit number to the prosecutor's attention, or that the prosecutor had responded that the exhibit was "good to go."

The trial court confirmed that the clerk had never checked with the court about an exhibit that disclosed relator's prior convictions. The court specifically found that the jury had recognized that "there was a problem" with the jury having such an exhibit, that the jury had "raised [that problem] with the clerk," and that the clerk "did not do anything about it and may have lied" to the jury about checking with the judge. The court concluded that neither the parties nor the court ever knew that the jury had seen that exhibit until juror 6 contacted relator's trial counsel about three months after the trial.

Turning to relator's motion to dismiss the charges with prejudice, the trial court stated that the clerk had "made an error" but it did not find that the clerk had intentionally given the exhibit to the jury knowing that it disclosed relator's prior conviction. The court stated that, to grant the motion under *Kennedy*, 295 Or 260, it would have to make a finding of "indifference," which it concluded that it could not make in this case. The court explained:

"My enduring questions about [the clerk] [are]: Was she indifferent and willing to lie to cover up for her mistakes, for just being careless and just being willing to lie to cover up for it, or did she lack the capacity to do this job? And I don't know which of those it is."

Ultimately, the court stated that it was "a very close call," but it denied relator's motion to dismiss with prejudice. The court stated that it was "distinctly possible" that the clerk had acted with indifference and "was covering her tracks," but that it was also possible that the clerk "just didn't have the cognitive ability to do this job." The court further explained that it did not know whether the clerk "actually had the capacity to do this job or whether she just didn't care and was willing to cover her tracks when she made mistakes." As we will explain, the "enduring questions" mentioned by the trial court—whether the clerk was willing to lie to cover up for her mistakes, or whether she lacked the capacity to do the job—do not squarely address the findings that a trial court must consider under *Kennedy*.

The parties then inquired about whether the court needed to make additional findings, and the court responded by stating that it "could pull three or four stories out of a hat and tell you things that [had] happened that were mysterious, some of which [had] probably happened after this," and that those stories all had contributed to the court's conclusion that it "[didn't] know" exactly why this had happened. The court explained:

"I think it is possible that—that there's another reason for what happened and that I just was not aware of it. *** I just can tell you that that is my lasting judgment of what happened in this case and happened in other circumstances during [the clerk's] employment as well. *** [I]f that is sufficient to meet the indifference standard, then the Supreme Court will let me know."

The defense objected to the court's consideration of "things that are beyond the scope of this case and beyond the scope of the record in this case."[6]

---

[6] Because the issue in this mandamus proceeding is limited to whether the record compelled findings that would bar a retrial, we do not address whether the trial court may have erred in considering facts known to the trial court that are outside the scope of this record.

In a subsequent written order, the trial court stated it had received evidence and heard argument at the four hearings summarized above, and that relator's motion to dismiss with prejudice "is denied for reasons stated on the record."

## II.  ANALYSIS

### A.  *The Standard of Review and the Parties' Contentions*

Relator seeks mandamus relief to compel the trial court to dismiss the charges against him with prejudice.[7] ORS 34.110 authorizes this court to issue a writ of mandamus to a trial court "to compel the performance of an act which the law specially enjoins." *See also* Or Const, Art VII (Amended), § 2 (this court may, in its discretion, take original jurisdiction in mandamus proceedings). Our task "is not to conduct our own review of the facts; rather, it is to decide whether the evidence in the record, assessed under the correct legal standard, would have *compelled* a decision in relator's favor." *State ex rel Kristof v. Fagan*, 369 Or 261, 279, 504 P3d 1163 (2022) (emphasis in original).

Relator contends that Article I, section 12, of the Oregon Constitution, as interpreted in *Kennedy*, 295 Or 260, requires dismissal of the charges with prejudice because of the clerk's misconduct.[8] The *Kennedy* test cited by relator bars retrial when official misconduct "is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal." 295 Or at 276. Relator contends that (1) the clerk's misconduct here was so prejudicial that it cannot be cured by anything other than a mistrial; (2) the clerk knew that her actions were improper and prejudicial; and (3) the clerk was indifferent to the consequences

---

[7] Specifically, relator seeks dismissal of the two counts that were tried to a jury.

[8] The parties base their arguments on Article I, section 12, which, as noted above, provides that no person "shall be put in jeopardy twice" for the same offense. We note that a statute, ORS 131.515, also bars prosecuting a person twice for the same offense, subject to exceptions stated in ORS 131.525. One exception applies when the previous prosecution was properly terminated because "[p]rejudicial conduct, in or outside the courtroom, ma[de] it impossible to proceed with the trial without injustice" to the defendant or the state. ORS 131.525(1)(b)(C).

to relator.[9] Relator acknowledges that the trial court did not find that the clerk's misconduct amounted to "indifference" under the *Kennedy* standard, but he contends that the record compelled that finding, and thus, compelled dismissal of the charges with prejudice.

In response, the state agrees with relator on two points: that the *Kennedy* test applies in this case and that the clerk's conduct was so prejudicial that a mistrial was required. The state contends, however, that the trial court did not find—and the record here did not compel it to find— that the clerk had known that her actions were improper and prejudicial or that her conduct had amounted to indifference under the *Kennedy* standard.

Because relator does not contend that the trial court made the findings required for a dismissal with prejudice under *Kennedy*, our task here is narrowly confined to determining whether the record here compelled such findings, specifically that (1) the clerk knew that her actions were improper and prejudicial; and (2) the clerk's conduct amounted to indifference under the *Kennedy* standard.

As we will explain, we agree with the state that the record here did not compel either finding. Because *Kennedy* is central to the parties' arguments, we begin with a detailed discussion of that case and an earlier case, *State v. Rathbun*, 287 Or 421, 600 P2d 392 (1979), that was cited in *Kennedy* and that specifically addressed a dismissal with prejudice based on a mistrial caused by a courtroom clerk's misconduct. We address both cases next, beginning with *Rathbun*.

B.   *Dismissal with Prejudice Under* Rathbun *and* Kennedy

The defendant in *Rathbun*, 287 Or 421, had been charged with first-degree robbery (armed with a firearm). After deliberating for about a day, the jury informed the court that it was at an impasse, and the court granted the defendant's request for a mistrial. Two jurors then informed the prosecutor about comments that the bailiff[10] had made

---

[9]  Relator acknowledged at oral argument that the clerk's misconduct was not to intentionally cause a mistrial. Instead, relator contends that the clerk's objective was to cover up her misconduct and avoid a mistrial, rather than cause one.

[10]  Consistent with the terminology used at that time, this court referred to the courtroom clerk in *Rathbun* as a "bailiff."

during court recesses and during the jury's deliberations. Another judge interrogated the jurors about the bailiff's conduct and its effect on the jurors. In response, eight jurors stated that they had overheard at least part of the bailiff's remarks, which had addressed the sentencing habits of the trial judge when a gun is involved, the range of possible sentences for armed robbery, and what the bailiff had learned about "the criminal element of society" from riding in a patrol car with a police officer. 287 Or at 424. Seven jurors denied that those remarks had influenced their vote; two of those jurors stated that the comments had been very prejudicial to the defendant's case and thought that they might have influenced other jurors; and one juror acknowledged that she might have been influenced by the bailiff's remarks. *Id.*

Based on the transcript of that interrogation and a stipulation of facts, the defendant moved to dismiss the case with prejudice. The trial court granted that motion, the Court of Appeals reversed, and, on review, we reversed the Court of Appeals. We first rejected the state's argument that there had been "no causal relationship" between the bailiff's misconduct and the jury's inability to agree on a verdict. *Id.* at 423-24. We explained that the trial court had found that the bailiff had been motivated by "bad faith or prejudice" against the defendant, that her conduct could not have been "attributable to mere negligence," and that evidence in the record supported those findings. *Id.* at 424-25. Under those circumstances, we concluded that we should "assume, without proof," that there had been a causal relationship between the bailiff's misconduct and the mistrial. *Id.* at 426.

We next addressed the question of retrial, concluding that the bailiff's misconduct had been "so abhorrent to the sense of justice that * * * the same sanction is required to effectuate the constitutional command as in the case where the prosecutor or the judge intends to provoke a mistrial." *Id.* at 432-33. Accordingly, we held that the effect of Article I, section 12, barred a retrial. *Id.* at 433.[11] In reaching that

---

[11] The exact holding was that Article I, section 12, "prevents the application of ORS 131.525(2)(d) in these circumstances." 287 Or at 433. As noted, ORS 131.515(1) provides that no person shall be prosecuted twice for the same offense, "[e]xcept as provided in ORS 131.525[.]" ORS 131.525(2)(d) (1973), in turn,

conclusion, we rejected the contrary decision of the Court of Appeals, which had reasoned that retrial was permissible because the mistrial had not been "triggered by prosecutorial or judicial desire to harass the defendant or afford the prosecution a more favorable opportunity to convict." *Id.* at 429 (quoting *State v. Rathbun*, 37 Or App 259, 264, 586 P2d 1136 (1978)).

We turn to *Kennedy*, 295 Or 260, which, as noted, established the test that the trial court applied in this case. The defendant in *Kennedy* had been charged with theft. During trial, the prosecutor had asked a witness if he had chosen not to conduct business with the defendant because the defendant "was a crook." The defendant objected, and the trial court ruled that the question was impermissible and declared a mistrial. The defendant was later convicted on retrial and argued on appeal that the retrial had violated his former jeopardy rights under Article I, section 12, as well as the double jeopardy clause of the United States Constitution.[12] The Court of Appeals agreed and reversed. *State v. Kennedy*, 49 Or App 415, 419, 619 P2d 948 (1980), *rev den*, 290 Or 551 (1981).

We denied review, but the United States Supreme Court granted *certiorari* and reversed the Court of Appeals' decision on federal constitutional grounds. *Oregon v. Kennedy*, 456 US 667, 102 S Ct 2083, 72 L Ed 2d 416 (1982). On remand, the Court of Appeals assumed that the federal standard identified by the United States Supreme Court also applied under Article I, section 12, and affirmed the defendant's conviction. We then allowed review to examine the Court of Appeals' assumption that the standard under the former jeopardy clause of the Oregon Constitution is identical to the federal standard. 295 Or at 262. We ultimately concluded that "Oregon law is not identical but nevertheless leads to an affirmance of this conviction." *Id.*

_____

provided that a previous prosecution does not bar a retrial if the first trial was terminated because the jury was unable to agree on a verdict. (That exception is now listed under ORS 131.525(1)(b)(D).) Thus, because Article I, section 12, prevented the application of ORS 131.525(2)(d) (1973), we concluded that "ORS 131.515(1) bars the retrial of the defendant." *Id.*

[12] The double jeopardy clause, found in the Fifth Amendment to the United States Constitution, provides, in part, that no person "shall *** be subject for the same offence to be twice put in jeopardy of life or limb[.]"

In reaching that conclusion, we considered several alternative tests for determining when a retrial is barred by Article I, section 12. We rejected the federal standard and alternative formulations based on that standard, all of which had required intentional misconduct designed to "provoke the defendant into moving for a mistrial." *Id.* at 269. We identified two problems with that approach. First, because it primarily focused on prosecutorial misconduct, it would not account for other officials whose conduct may cause a mistrial, such as the bailiff's misconduct in *Rathbun*. The bailiff's intention in *Rathbun*, we noted, was "not to cause a mistrial, but to assist the state in securing a conviction." *Id.* at 275.

Second, we reasoned that requiring intentional misconduct "places too heavy a burden" on a defendant seeking to establish that a retrial after a mistrial caused by official misconduct is barred by Article I, section 12. *Id.* at 276. Instead, we explained that, in that context, "it suffices that [the official] has consciously chosen to engage in prejudicial misconduct, whatever the [official's] motive." *Id.* Thus, we concluded that Article I, section 12, bars a retrial "when improper official conduct is so prejudicial to the defendant that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the resulting mistrial or reversal." *Id.* In ruling on a motion to bar reprosecution after a mistrial, we explained, a trial court "must find whether the official in fact" had taken action that the official knew to be prejudicial misconduct. *Id.* at 277. We further explained that, although incompetence might lead to a mistrial, that is not enough to bar a retrial because "it does not reflect a willingness to risk placing the defendant repeatedly in jeopardy for the same offense." *Id.*

In reaching that conclusion, we noted—citing *Rathbun* and the history and policies underlying the constitutional former and double jeopardy provisions—that the bar against prosecution following a mistrial "must be derived from the constitutional objective to protect defendants against the harassment, embarrassment and risk of successive prosecutions for the same offense," and that such

a bar "is not a sanction to be applied for the punishment of prosecutorial or judicial error." *Id.* at 272-73 (internal quotation marks omitted). Understanding the constitutional former and double jeopardy provisions "as protection rather than as sanction," we explained, "has implications for the rule against reprosecutions." One of those implications was that it "implies a requirement of some conscious choice of prejudicial action" as a prerequisite to barring retrial. *Id.* at 273. Thus, we explained, "[n]egligent error, 'gross' or otherwise, is not enough." *Id.*

Having determined the appropriate test under Article I, section 12, we affirmed the conviction in *Kennedy* because "there was no finding that the prosecutor [had] knowingly acted in an improper and prejudicial manner, indifferent to the mistrial that could be expected to result." *Id.* at 277. Nor could we infer such a finding from the record. Thus, we concluded that, "[o]n this record, \*\*\* the criteria for imposing a constitutional bar against a second trial were not met." *Id.* at 278.

C.   *Application in this Case*

Before addressing the specific questions presented in this case—whether, under *Kennedy*, the record here compelled findings that the clerk had "knowingly" engaged in improper and prejudicial conduct, with "indifference" to the consequences—we address three preliminary issues that were resolved in *Rathbun* and *Kennedy*. First, those cases make it clear that the test for determining whether official misconduct causing a mistrial bars retrial is the same regardless of whether the misconduct is by a courtroom clerk, a prosecutor, or a judge. *See Rathbun*, 287 Or at 432-33 (concluding that, in assessing misconduct by a clerk, prosecutor, or judge, the same result "is required to effectuate" the constitutional former and double jeopardy protections); *Kennedy*, 295 Or at 268 (noting that, although *Rathbun* involved a bailiff's misconduct, and *Kennedy* involved a prosecutor's, the question common to both cases was whether the circumstances barred a mistrial). Second, the fact that the trial court had declared a mistrial based on a deadlocked jury before the clerk's misconduct had been discovered does not matter. *See Rathbun*, 287 Or at 423 (noting that bailiff's

misconduct was discovered after the jury informed the trial court that it was "at an impasse," and the court had declared a mistrial). Third, conduct that seeks to avoid, not cause, a mistrial is not dispositive. *See Kennedy*, 295 Or at 275 (noting that the bailiff in *Rathbun* was "motivated by her intention, not to cause a mistrial, but to assist the state in securing a conviction"). Accordingly, the only issue in this mandamus proceeding is whether the record here compelled the requisite findings that would bar a mistrial under the *Kennedy* test.

Regarding the first finding, as to the clerk's mental state, relator contends that the record established that the clerk had "knowingly" acted improperly because she knew that the jury should not be informed about relator's prior convictions, and, although she may not have knowingly given the exhibit disclosing those convictions to the jury at the outset of deliberations, she certainly acted knowingly when the jury asked about the exhibit and, in response, she allowed the jury to retain the exhibit and lied about checking with the court.[13] That may have been a permissible inference—and perhaps even the most plausible inference— but it is not one that the trial court drew from the hearing testimony. Instead, the trial court found that the clerk had made a mistake in giving the jury the exhibit, the jury had recognized that there had been a problem with that exhibit, the jury had brought that problem to the clerk's attention, and, in response, the clerk had not taken any action and *may have* lied about the judge approving the jury's consideration of that exhibit.

The relevant finding under *Kennedy* is whether the clerk knew that she had engaged in prejudicial misconduct, not whether the clerk had lied to the jury. *See Kennedy*, 295 Or at 277 (noting that, in ruling on a motion to bar retrial, the trial court "must find whether the official in fact had [the] knowledge" that its conduct was improper and prejudicial). Thus, the trial court's "enduring questions" about

---

[13] Relator contends that the fact that a "log sheet" of exhibits in this case was never found, but that the clerk had filed log sheets in other cases, demonstrates that the clerk must have destroyed the log sheet in this case to cover up her misconduct. That is one possible inference, but not the only possible inference, that can be drawn from this record.

whether the clerk had been willing to lie to cover up for her mistakes, or had been incapable of doing the job, do not match the findings that a trial court must address under *Kennedy*. As a result, the trial court did not make a finding that the clerk had ever known that her actions were improper and prejudicial. Nor was that finding compelled by this record. As summarized above, although the clerk had acknowledged that she knew the jury was not to hear about relator's prior convictions, and the record establishes that the clerk had in fact given the jury an exhibit that disclosed those convictions, the record does not compel a finding that the clerk had ever knowingly given the jury an exhibit that the clerk knew revealed relator's prior felony conviction.

Nor did the record compel a finding that the clerk had discovered her mistake and knowingly allowed the jury to retain an exhibit that disclosed relator's prior convictions after the jury brought that problem to the clerk's attention. The clerk's testimony was that she thought that all the exhibits that she had given to the jury were appropriate; she did not testify that she had ever known that she had mistakenly given the jury an exhibit disclosing relator's prior convictions, either when she first gave the exhibits to the jury or when a juror had subsequently asked her about an exhibit. The declaration from juror 6, and the testimony from jurors 5 and 49, do not clearly establish that the clerk had *knowingly* given them an exhibit that revealed relator's prior convictions, that she had allowed the jury to retain the exhibit knowing that it revealed relator's prior convictions, or that she had lied about checking with the judge regarding that exhibit.

Instead, the jurors' testimony about their interactions with the clerk was vague, uncertain, and inconclusive. For example, the jurors had different recollections about whether an exhibit disclosing relator's prior convictions—as opposed to an exhibit that had been marked differently— had been brought to the attention of the clerk at all, and if so, what the clerk's response had been. Juror 6 stated in his declaration that he had brought the exhibit that disclosed relator's prior conviction to the attention of the presiding juror and did not know whether the presiding juror had

brought the exhibit to the attention of the clerk or the court. Juror 5—the presiding juror—testified that he thought that juror 49 had discussed an exhibit that appeared to be different from the other exhibits with the clerk. Juror 49 thought that another juror—a male juror—may have asked the clerk about an exhibit. Jurors 5 and 49 could not recall specifically what had triggered a juror's inquiry about the exhibit aside from the exhibit sticker, and neither juror could recall what the clerk had said in response to the juror's inquiry.[14] No juror testified that the clerk had affirmatively stated to the jury that the judge had approved the jury's consideration of an exhibit that disclosed relator's prior felony conviction.

Given the clerk's careless and improper handling of trial exhibits as described by her supervisor, it is certainly possible that the clerk had mistakenly allowed the jury to receive and retain the exhibit. And because the jurors' testimony was so uncertain, the record does not compel a finding that the jury had specifically asked the clerk about the exhibit that disclosed relator's prior convictions, or how the clerk had responded to such an inquiry. Thus, on this record, although it is certainly plausible that the clerk realized her mistake when the jury inquired about an exhibit and knowingly allowed the jury to retain the exhibit, with the knowledge that doing so was improper and prejudicial, that conclusion is not compelled by this record.

And as explained above, mandamus is available only if the evidence in the record "would have *compelled* a decision in relator's favor." *State ex rel Kristof*, 369 Or at 279 (emphasis in original). The evidence here did not *compel* a finding that the clerk knowingly allowed the jury to retain an exhibit knowing that it disclosed relator's prior conviction because it is possible—though perhaps less likely—that the clerk did not realize her mistake when the jury inquired about an exhibit, and that she failed to take any action because she did not specifically realize that the exhibit revealed relator's prior convictions. That conclusion

---

[14] In addition, juror 5 testified that the clerk might have taken an exhibit from the jury and returned with it a short time later, but juror 49 did not recall the clerk taking an exhibit out of the jury room. Juror 6 remembered seeing an exhibit that disclosed relator's prior felony conviction but did not mention in his declaration that the clerk had taken that exhibit from the jury.

is consistent with the clerk's testimony that she did not ever "have a specific memory" of giving the jury an exhibit that disclosed relator's prior conviction, and it is also consistent with the supervisor's testimony about the clerk's carelessness in performing her job. Even gross negligence on the part of an official is "not enough" under *Kennedy*, 295 Or at 273, to bar a retrial under Article I, section 12. Given the jurors' uncertain recollections, although it is also possible that the clerk may have realized her error, knowingly failed to take any action, and then lied about the judge approving the jury's consideration of that exhibit, the trial court did not make those findings, nor were they compelled by this record, as required for mandamus relief.[15]

Turning to the second component of the *Kennedy* test, the record here also did not compel a finding that the clerk had acted with indifference to the consequences. Relator contends that indifference was established by evidence showing that the clerk had lied to the jury about checking with the court and had then lied to the court to cover up her actions to avoid a mistrial, and possibly, to avoid the negative employment consequences that would likely follow. It may have been permissible to infer that the clerk had lied, and, in turn, that her lying showed that she was indifferent to the consequences of her actions, but the trial court stated that it could not make a finding of "indifference," and such a finding was not compelled by this record.

That conclusion is supported by the underlying purposes of the "indifference" standard that we adopted in *Kennedy*. As we explained, determining what constitutes "indifference" in this context is informed by the purpose of the constitutional bar against retrial following a mistrial caused by official misconduct. 295 Or at 273. Because that

---

[15] The testimony from juror 49—that, when another juror raised an issue about one of the exhibits, the clerk "would have" brought that issue to the judge's attention—is also not enough to compel a finding that the clerk knowingly acted in an improper and prejudicial manner. Juror 49 did not specifically remember how the exhibit was brought to the clerk's attention, nor what the clerk's response was about the exhibit. And although the trial court found that the clerk had not been credible in her testimony about checking with the attorneys before giving the exhibits to the jury, the court did not make a specific finding that the clerk had lied to the jury about the exhibit. Instead, the court wondered whether the clerk had been "willing to lie" to cover up for her mistake without answering that question.

purpose is to protect the defendant, not sanction the official, one of the consequences of the *Kennedy* test is that, while intentional misconduct is not required, indifference requires evidence showing "some conscious choice of prejudicial action." *Id.*

The record here does not compel a finding that the clerk had made a "conscious choice of prejudicial action" as required to establish indifference. Although the clerk may have been careless in allowing the jury to consider and retain the prohibited exhibit revealing relator's prior felony conviction, the evidence in this record did not compel a finding that the clerk had made a "conscious choice of prejudicial action," or that she had even made a conscious choice at all when she allowed the jury to consider that exhibit throughout its deliberations. Thus, the purpose of the constitutional protection would not be met by barring a retrial on this record.

## III.   CONCLUSION

The evidence in this record did not compel either of the findings that would bar a retrial of relator under Article I, section 12, consistently with this court's decision in *Kennedy*, 295 Or 260. Specifically, the record did not compel findings that the clerk (1) knew that her actions were improper and prejudicial; and (2) acted with indifference to the consequences. Accordingly, the trial court was not compelled to grant relator's motion for dismissal with prejudice.

The petition for a writ of mandamus is denied.